Appeal No. 2017-2145

# United States Court of Appeals

*for the*

# Federal Circuit

CISCO SYSTEMS, INC.,

*Plaintiff-Appellant,*

– v. –

ARISTA NETWORKS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA IN
CASE NO. 5:14-CV-05344-BLF, JUDGE BETH LABSON FREEMAN

## BRIEF FOR PLAINTIFF-APPELLANT

SEAN S. PAK
QUINN EMANUEL URQUHART
  &SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600

KATHLEEN M. SULLIVAN
TODD ANTEN
OWEN ROBERTS
QUINN EMANUEL URQUHART
  &SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff-Appellant*

September 13, 2017

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Cisco Systems, Inc. certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Cisco Systems, Inc.

**2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

N/A

**3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:**

None.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:**

<u>Quinn Emanuel Urquhart & Sullivan, LLP:</u> Carl G. Anderson; Todd Anten; Amy H. Candido; Matthew Cannon; Steven C. Cherny (previously of Kirkland & Ellis LLP); Andrew M. Holmes; David A. Nelson; Jason L. Liu; John M. Neukom; Jordan R. Jaffe; Sara E. Jenkins; Peter A. Klivans; Sean S. Pak; Owen Roberts; Kathleen M. Sullivan; Kenneth K. Suh; Lance L. Yang; Mark Y. Tung

<u>Desmarais LLP:</u>  Tom BenGera; Paul A. Bondor; John M. Desmarais; Brian Leary;

Tamir Packin; Michael R. Rhodes

<u>Kirkland & Ellis LLP:</u>  Adam R. Alper; Michael W. De Vries; Brian P. Gearing; Alan

S. Kellman; Joshua L. Simmons; Michael A. Wueste

<u>Covington & Burling LLP:</u>  Phillip H. Warren

<u>Boise, Schiller & Flexner:</u>  Richard A. Feinstein

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................... ii

TABLE OF CONTENTS ............................................................................... iv

TABLE OF AUTHORITIES .......................................................................... vi

STATEMENT OF RELATED CASES .......................................................... ix

PRELIMINARY STATEMENT .................................................................... 1

JURISDICTIONAL STATEMENT .............................................................. 4

STATEMENT OF THE ISSUES ................................................................... 4

STATEMENT OF THE CASE ...................................................................... 5

    A.    Cisco's Command-Line Interface ("CLI") ................................. 6

    B.    The Trial Evidence On Cisco's Creation Of Its CLI ................. 11

    C.    The Trial Evidence On Arista's "Slavish" Copying ................. 16

    D.    The Trial Evidence On Scènes À Faire ................................... 18

    E.    The Jury Instructions ............................................................. 19

    F.    The Jury Verdict ..................................................................... 21

    G.    The District Court's JMOL Order ......................................... 21

SUMMARY OF ARGUMENT ..................................................................... 23

STANDARD OF REVIEW ........................................................................... 25

ARGUMENT ................................................................................................ 26

I.    JUDGMENT SHOULD BE GRANTED FOR CISCO ON SCÈNES À FAIRE AS A MATTER OF LAW BECAUSE NO REASONABLE JURY COULD FIND THAT ANY OF CISCO'S COMPILATIONS WAS DICTATED BY EXTERNAL FACTORS AT THE TIME OF CREATION ................................................................................. 26

A.    The Record Lacks Substantial Evidence That Cisco's Compilation Of Multiword Commands Is Scènes À Faire ................28

    1.    "External Factors" ....................................................29

    2.    "Dictated" ................................................................33

    3.    "At The Time Of Creation" .....................................34

B.    The Record Lacks Substantial Evidence That Any Of Cisco's Other Compilations Is Scènes À Faire ................................36

C.    The District Court Committed Legal Error In Finding Scènes À Faire Based On "Functionality" And "Preexisting Network Industry Protocols" ................................................................37

    1.    "Functionality" .........................................................38

    2.    "Preexisting Network Industry Protocols" ..............40

D.    The District Court Committed Legal Error In Finding Scènes À Faire Based On "Customer Demands" For "Consistency" ................52

II.    SCÈNES À FAIRE CANNOT SERVE AS A DEFENSE TO ARISTA'S VIRTUALLY IDENTICAL COPYING, AS A MATTER OF LAW ........................................................................55

A.    The Jury Necessarily Found That Arista's Copying Was Virtually Identical ................................................................56

B.    Cisco Preserved The Argument That Scènes À Faire Cannot Excuse Arista's Virtually Identical Copying ......................58

CONCLUSION ....................................................................61

ADDENDUM ......................................................................62

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Antonick v. Electronic Arts, Inc.*,
    841 F.3d 1062 (9th Cir. 2016) ....................................59

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. 1994) ............... 4, 24, 26, 28, 49, 55, 56, 58

*Atari Games Corp. v. Oman*,
    888 F.2d 878 (D.C. Cir. 1989)....................................56

*B2B CFO Partners, LLC v. Kaufman*,
    787 F. Supp. 2d 1002 (D. Ariz. 2011) ........................ 34, 44

*Bains LLC v. Arco Prods. Co.*,
    405 F.3d 764 (9th Cir. 2005) .................................. 39, 57

*Callicrate v. Wadsworth Mfg., Inc.*,
    427 F.3d 1361 (Fed. Cir. 2005) ....................................25

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
    44 F.3d 61 (2d Cir. 1994) .................................... 40, 53

*CDN Inc. v. Kapes*,
    197 F.3d 1256 (9th Cir. 1999) ....................................40

*Curcio Webb LLC v. Nat'l Benefit Programs Agency, Inc.*,
    2006 WL 47506 (S.D. Ohio Jan. 9, 2006)........................ 35, 53

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ....................................54

*EEOC v. Go Daddy Software, Inc.*,
    581 F.3d 951 (9th Cir. 2009) .................................. 59, 60

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
    26 F.3d 1335 (5th Cir. 1994) ....................................55

*Ets-Hokin v. Skyy Spirits, Inc.*,
    323 F.3d 763 (9th Cir. 2003) ....................................56

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) ....................................50

*Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*,
    499 U.S. 340 (1991) .......................................... 28, 53

*Frybarger v. Int'l Bus. Machs. Corp.*,
    812 F.2d 525 (9th Cir. 1987) .................................. 27, 55

*Harner v. Wong Corp.*,
   2013 WL 11549284 (D.N.M. Oct. 31, 2013) ...............................................44

*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989) ................................................................. 28, 41

*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980) ...................................................................56

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
   400 F.3d 1007 (7th Cir. 2005) ...............................................................56

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
   734 F.3d 1352 (Fed. Cir. 2013) ..............................................................25

*IvyMedia Corp. v. iLIKEBUS, Inc.*,
   2017 WL 2125672 (D. Mass. May 15, 2017).............................................32

*J. Thomas Distribs., Inc. v. Greenline Distribs., Inc.*,
   100 F.3d 956 (6th Cir. 1996) ..................................................................50

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991)...................................................................................60

*Key Publ'ns, Inc. v. Chinatown Today Pub'g Enters., Inc.*,
   945 F.2d 509 (2d Cir. 1991) ................................................................ 50, 51

*Kusens v. Pascal Co.*,
   448 F.3d 349 (6th Cir. 2006) ..................................................................59

*Lakeside-Scott v. Multnomah Cty.*,
   556 F.3d 797 (9th Cir. 2009) ..................................................................25

*Lange v. Penn Mut. Life Ins. Co.*,
   843 F.2d 1175 (9th Cir. 1988) ................................................................49

*Lebron v. Nat'l R.R. Passenger Corp.*,
   513 U.S. 374 (1995)..................................................................................60

*Merch. Transaction Sys., Inc. v. Nelcela, Inc.*,
   2009 WL 723001 (D. Ariz. Mar. 18, 2009)..........................................29, 43

*Metcalf v. Bochco*,
   294 F.3d 1069 (9th Cir. 2002) .............................................................29, 43

*MiTek Holdings, Inc. v. Arce Eng'g Co.*,
   89 F.3d 1548 (11th Cir. 1996) ................................................................49

*Mitel, Inc. v. Iqtel, Inc.*,
   124 F.3d 1366 (10th Cir. 1997) ..............................................................31

*Oracle America, Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) ................................. 3, 26, 35, 38, 39, 40, 49

*Publ'ns Int'l, Ltd. v. Meredith Corp.*,
　88 F.3d 473 (7th Cir. 1996) ........................................................45

*Rebel Oil Co. v. Atl. Richfield Co.*,
　51 F.3d 1421 (9th Cir. 1995) ......................................................50

*Reeves v. Sanderson Plumbing Prods., Inc.*,
　530 U.S. 133 (2000)............................................................. 25, 30

*Reeves v. Teuscher*,
　881 F.2d 1495 (9th Cir. 1989) ...................................................59

*Richards v. Neilsen Freight Lines*,
　810 F.2d 898 (9th Cir. 1987) .....................................................50

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
　118 F.3d 955 (2d Cir. 1997) ................................................ 26, 49

*Thompson v. Runnels*,
　705 F.3d 1089 (9th Cir. 2013) ...................................................60

*W. Watersheds Project v. U.S. Dep't of the Interior*,
　677 F.3d 922 (9th Cir. 2012) .....................................................60

*Yee v. Escondido*,
　503 U.S. 519 (1992)...................................................................60

## Additional Authorities

17 U.S.C. § 101 .............................................................................49

2 William F. Patry,
　PATRY ON COPYRIGHT § 3:65 (2017) ..........................................49

4 Melville B. Nimmer & David Nimmer,
　NIMMER ON COPYRIGHT § 13.03[B][1][a] (2017).........................58

ABA MODEL JURY INSTRUCTIONS:
　COPYRIGHT, TRADEMARK AND TRADE DRESS LITIGATION § 1.4.8
　(Todd S. Holbrook & Alan Nathan Harris eds., 2008).................56

BLACK'S LAW DICTIONARY (10th ed. 2014) ...........................................50

Fed. R. Civ. P. 50(a).................................................. 23, 24, 58, 59, 60

Fed. R. Civ. P. 50(b) ................................................. 21, 58, 59, 60

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Plaintiff-Appellant states that no appeal from this civil action has previously been before this Court or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(b), Plaintiff-Appellant identifies the following case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal: *Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 5:16-cv-00923-BLF (N.D. Cal.) (Freeman, J.).

## PRELIMINARY STATEMENT

In this case, Arista admitted that it "slavishly" copied Cisco's copyrighted command-line user interface ("CLI") to create a directly competing user interface. Arista promised its customers that Arista's CLI would provide a "99.999 percent" "drop-in replacement" for Cisco's CLI. Arista's leaders openly touted its copying of Cisco's CLI as reducing Arista's customers' costs to retrain their engineers and as saving Arista massive costs on research and development—in the words of Arista's CEO, "where we don't have to invent, we don't." In light of this overwhelming evidence of blatant copying, the jury found that Arista had infringed Cisco's copyrighted works. The jury also rejected Arista's affirmative defenses of fair use, merger and copyright misuse and abandonment.

Nonetheless, the jury found Arista's infringement excused by the affirmative defense of scènes à faire, and the District Court for the Northern District of California (Freeman, J.) denied JMOL for Cisco. That ruling requires this Court's reversal. The sole protected expression at issue in this case is Cisco's *compilations* of multiword commands and related compilations—not any individual terms or command lines within those compilations. And no reasonable jury could find on the record here that external factors akin to stock plots, themes or characters in literature dictated Cisco's choices in selecting, arranging, organizing and designing those compilations at the time of their creation—as the scènes à faire defense requires.

To the contrary, the undisputed evidence showed that Cisco could have expressed and structured its CLI in innumerable other ways—as shown by the fact that other Cisco competitors chose to write and structure their CLIs quite differently rather than engage in blatant wholesale copying of Cisco's CLI. The undisputed evidence also showed that no mechanical constraints operated upon Cisco's textual choices about how to express and structure its CLI compilations. And the undisputed evidence showed that no network industry standard protocols exist for CLIs or constrain how they are structured. In the absence of any substantial evidence of such external constraints at the time of creation, it was error to deny judgment for Cisco on scènes à faire, even taking all inferences in favor of the verdict.

The district court reached its mistaken conclusion that the evidentiary record showed scènes à faire by committing two fundamental legal errors that, unless reversed, threaten to undermine copyright protection for compilations in a wide variety of high-tech industries. The decision below also invites copying of protected compilations in contexts outside high tech—including documentary films, anthologies, portfolios, databases, remixes, mash-ups, archival works, collections, mosaics and montages.

*First*, the district court erred in ruling that Cisco's compilation of multiword commands and related compilations were dictated by "functionality" and prior "industry protocols." The only evidence the court cited for this finding is evidence

2

that Cisco used certain **individual** "industry terms" from prior industry protocols—such as "VRRP," "PTP," "ipv6," "ip gimp" (sic) and "PIM." But many computer programs use individual terms from prior protocols, and that does not excuse blatant copying of the whole computer program any more than the repeated prior use of the term "the" excuses blatant copying of *The Cat In The Hat*. The decision below thus jeopardizes the enforceability of copyrights in any interface or other program that has copyright protection by virtue of its "sequence, structure, and organization." *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1355-56 (Fed. Cir. 2014). Such protection would be rendered meaningless if all it takes to excuse infringement is to show that individual words or phrases within a compilation might be scènes à faire.

*Second*, the district court erred in ruling that Cisco's compilation of multiword commands and related compilations were constrained by Cisco's desires for "consistency" based on "customer demand." Evidence of Cisco's internal guidance to its own engineers—for example, through its "Parser Police Manifesto"—is not evidence of any **external** constraint. And evidence of a desire for internal consistency in Cisco's commands after it created them is not evidence of any external constraint, let alone a constraint **at the time of creation**. If consistent development of an initial text rendered an author's later texts scènes à faire, then *Harry Potter* volumes 2 through 7 could be deemed scènes à faire merely because they consistently included the same characters and setting (Harry, Hermione and Hogwarts) and employed the

same specialized vocabulary ("muggles" and "*wingardium leviosa!*") as in volume 1. This Court should reject any such dramatic and unprecedented expansion of the scènes à faire defense.

Because no reasonable jury could find that scènes à faire excused Arista's blatant copying of the selection, arrangement, organization and design of Cisco's original and protected CLI compilations, this Court should reverse and direct entry of judgment for Cisco on copyright liability. *See infra* Part I. The Court should also reverse for the additional and independent reason that, as a matter of Ninth Circuit law, scènes à faire can never excuse virtually identical copying like Arista's here. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994). *See infra* Part II.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. The district court entered a final judgment on December 19, 2016, and Cisco timely moved for JMOL on January 17, 2017, which was denied on May 10, 2017. Appx20. Cisco timely appealed on June 6, 2017. Appx4403-4405. Because this action included patent claims, this Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in denying JMOL because the record fails to provide legally sufficient evidence to show that, at the time of creation, external

factors dictated Cisco's selection, arrangement, organization and design of its original and protected CLI multiword command and other compilations, as required to support an affirmative defense of scènes à faire.

2.      Whether the district court committed legal error in ruling that individual terms from prior industry protocols can establish scènes à faire as to a compilation of multiword commands or related responses.

3.      Whether the district court committed legal error in ruling that choices directed at internal consistency can establish scènes à faire as to a compilation of multiword commands or related responses.

4.      Whether the district court erred as a matter of law in allowing the affirmative defense of scènes à faire to excuse virtually identical copying.

## STATEMENT OF THE CASE

This appeal arises from a final judgment after jury trial excusing Arista from copyright infringement based on the affirmative defense of scènes à faire.  Appx1. The jury found that Arista infringed Cisco's copyright in Cisco's original and protected CLIs and rejected the affirmative defenses of fair use, merger and copyright misuse and abandonment, but nonetheless found Arista's infringement excused by the affirmative defense of scènes à faire.  Appx1428-1429.  Cisco moved for JMOL on scènes à faire, which the district court denied.  Appx2-20.

## A.    Cisco's Command-Line Interface ("CLI")

The copyrighted works at issue are the textual command-based user interfaces of four operating systems—IOS, IOS-XR, IOS-XE and NX-OS (collectively, "IOS")—that Cisco created and owns.  These operating systems enable the operation of network switches (which connect computers within a local network) and routers (which connect networks).   Appx10455-10456 (Christine Bakan, Cisco Senior Director of Product Management).  Switches and routers are the hardware spine of the internet, and Cisco's networking products are the most popular in the industry. Appx10448-10449 (Bakan); Appx10468 (Bakan).  Each of the four operating systems runs on different products tailored to network engineers' needs; for example, NX-OS operates switches and routers in data centers, while IOS-XR runs on products for communications companies.  Appx10463 (Bakan).

In all four operating systems, network engineers communicate with, troubleshoot, and interact with switches and routers through a user interface known as a command-line interface, or "CLI."  Appx10460 (Bakan).  A CLI is a text-based interface in which the user types a series of words (a "command") into a prompt and hits enter, at which point the device interprets the command and displays a response. Appx10501-10503 (Kirk Lougheed, Cisco Fellow and Senior Networking Engineer). The CLI commands are not source code or a series of ones and zeroes; they are declarative sentences that are read and understood by a human operator using the

devices. *See* Appx11079 (Pradeep Kathail, Cisco Chief Network Architect) ("CLI is typically an interface for human[s] to interact with machines, because it's a text-based" system, where "you type a command" and "text response comes back").[1]

As the undisputed trial testimony made clear, Cisco's engineers were free to choose the text and structure of CLI commands without any mechanical constraint from a networking switch or other device. Appx10518-10519 (Lougheed) (no functionality restrictions on what words an engineer chose to use). Thus, an "engineer was able to use their own creativity and judgment in making the commands" that comprise Cisco's CLI. Appx10663 (Phillip Remaker, Cisco Distinguished Engineer). As an example, a CLI author could choose to write the same command, eliciting the same response, by selecting either the words "show clock" or "display time." *See* Appx10518-10519 (Lougheed). If "show clock" is chosen, the author may seek consistency by creating other commands using the term "show" (*e.g.*, "show IP," "show route"). Appx10520 (Lougheed); Appx10673 (Remaker).

While the idea of using a CLI was familiar by the 1980s, Appx10505 (Lougheed), the Cisco CLI at issue here was a new work when Cisco engineer Kirk Lougheed and other early Cisco employees created it in 1986, shortly after the

---

[1] CLIs are not the only forms of user interfaces; common alternatives include graphical user interfaces ("GUIs"), which allow interaction through pictures and images as the user clicks on icons; and menu-driven interfaces, where the user selects from a pre-selected set of options displayed on the screen. Appx10504 (Lougheed).

company's founding, Appx10501 (Lougheed). Cisco's CLI was necessarily original, as the networking switches and routers it was designed to communicate with were not even commercially available until Cisco invented them. Appx10494-10495 (Lougheed); Appx10499 (Lougheed). As Cisco's Mr. Lougheed testified, "I had a new problem. I had a new technology … [T]here were new demands that the other, older command-line interfaces would just not support." Appx10505 (Lougheed).

The original CLI that Cisco's engineers created allows network engineers to manage, configure, and interact with network switches and routers. Cisco's CLI has four basic building blocks: (1) multiword command lines; (2) modes and prompts; (3) command responses; and (4) help descriptions. The Cisco CLI user types in multiword command lines at any of several on-screen prompts, each of which signals a different mode that grants access to a different set of commands. Appx10507-10509 (Lougheed). Structuring modes and prompts in this way speeds up the user's typing and reduces the opportunity for error compared with earlier CLIs, where every relevant parameter had to be typed into each command. Appx10513 (Lougheed). In response to typed commands, Cisco's CLI generates textual command responses (or screen "outputs"). Appx10523-10525 (Lougheed). While typing of a command, a user can also enter a "?", which elicits a textual help description that explains the command's function and use. Appx10525-10527 (Lougheed).

Cisco's CLI creators organized and arranged the multiword commands (and related responses) into different, particular hierarchies. Appx10519-10520 (Lougheed). For example, beginning a command with the word "ip" enables the user to access a hierarchy of "ip" commands like "ip route." Beginning a command with the word "show," by contrast, enables the user to access a different hierarchy—the hierarchy of "show" commands like "show ip route":

 

*Excerpt of "ip" Hierarchy*        *Excerpt of "show" Hierarchy*

Similarly, the selection of word order determines in which command hierarchy a command will be placed. For example, a command that begins "show spanning-tree" follows a different expressive path through a different hierarchy than a command that begins "spanning-tree show":



***Excerpt of "show" Hierarchy***



***Excerpt of "spanning-tree" Hierarchy***

Before Cisco created its CLI, other CLIs did not organize or arrange their commands within hierarchies, but rather "basically all the commands [were] at the same level." Appx10520 (Lougheed).

Cisco's network switches and routers are still primarily managed through its CLI. Appx10468 (Bakan). Cisco offers customers comprehensive training to master its CLI, through programs like the Cisco Certified Internetwork Expert ("CCIE") certification course, which more than 40,000 network engineers have taken since 1993. Appx10738-10740 (Terry Slattery, former Cisco CLI consultant); Appx12037 (Michael Volpi, former Cisco Chief Strategy Officer).

**B.      The Trial Evidence On Cisco's Creation Of Its CLI**

Cisco's made original choices in selecting, arranging, organizing and designing

its CLI beginning in 1986.  As Kirk Lougheed, one of the creators of Cisco's CLI,

explained:

> There weren't any other devices like this at the time.  There
> were not any expectations that the customers had, that there
> was a way of doing this or there was a way of talking about
> it or even the choice of words.  … [W]e could certainly
> have chosen different words to do this.
>
> …
>
> [A]t this time there were not existing customers.  There was
> no expectation of what sort of user interface of what choice
> of words people would use.

Appx10514 (Lougheed); Appx10518-10519 (Lougheed); *see* Appx10622 (Lougheed)

("I had a new problem to solve, and I was not particularly constrained by what choice

of commands or expressions or how I did things.").

The trial testimony showed that Cisco engineers were free to use subjective,

aesthetic judgment in creating and structuring Cisco's CLI.  As Mr. Lougheed

testified, in authoring and structuring the commands, he prioritized "my own

idiosyncratic things.  Certain words that appealed to me, certain words that were

shorter or longer.  I like words that are spelled out. …  I don't like dots in the middle

of things.  I like hyphens and not underscores."  Appx10516 (Lougheed); *see*

Appx11234-11235 (Dr. Kevin Almeroth, Cisco's technical expert) (noting that "the

use of the hyphen, some people say it's good, some people say it's bad. …  So in

11

some instances it's a design consideration whether [to] use a hyphen or not."); Appx11351 (Almeroth) (comparing Cisco CLI command term "router-id" to definition of "Router ID" in Tr. Ex. 5038 (Appx51808): "You will notice that [Cisco's is] lower case and the hyphen is added. Again, whether to have the hyphen, whether to name it the Router ID or any of the other commands that use other terms were all creative decisions.").

Such subjective, aesthetic judgment characterized the selection, arrangement, organization and design of Cisco's compilation of multiword commands in several ways. *First*, Cisco engineers were free to use any number of different individual terms within the individual multiword commands. *See e.g.* Appx10674-10677 (Remaker) (considered using "serial," "hardware," "controllers," and "devices" before selecting "inventory"); Appx10518 (Lougheed) (could have used "ipv4," "tcp-ip," or "internet-protocol" rather than "ip" when first selecting prefix); Appx10518 (Lougheed) (considered using "identifier" and "label" before selecting "address"); Appx10519 (Lougheed) (could have used "ip rules" or "permit list" instead of "access-list").

*Second*, Cisco engineers were free to sequence the selected words in numerous ways within the multiword commands. *See, e.g.*, Appx10514 (Lougheed) ("We could have chosen different orders of these words to do this."); Appx10667 (Remaker) ("[T]here are cases where you need to decide as an engineer if it makes sense to add a

12

new node into the hierarchy, it's not just a matter of picking the words but picking the logical place to place the words in the hierarchy.").

*Third*, Cisco engineers were free to organize and arrange the multiword commands in numerous ways within the various hierarchies, including by choosing to place any given multiword command within one hierarchy rather than another. *See, e.g.*, Appx10522 (Lougheed) ("There was nothing sacred about this particular ordering of commands or particular organizing principle. I could have organized things entirely by technology area"); Appx10655 (Remaker) (describing episodes in which "two camps of engineers had different opinions about, 'Well, we should add a new node not hierarchy,' 'No, it really should be a key word in the existing hierarchy.'"); Appx10682 (Remaker) ("The aesthetic is the way the CLI is organized" and "having this all feel of the interface."); Appx11234 (Almeroth) (discussing whether to place a command in the "show" or "ip" hierarchy: "Either would be possible. Either would be an option. There's no constraint or limitation that it's one versus the other.").

Such subjective, aesthetic judgments on the part of Cisco's engineers also characterized the selection, arrangement, organization and design of the other compilations comprising Cisco's CLI. *See, e.g.*, Appx10524-10525 (Lougheed) ("no constraint" or restrictions on text of screen outputs); Appx10527 (Lougheed) (there were no constraints, restrictions or functional demands "that would tell the engineers

you have to write the help description" in a certain way other than "be helpful");
Appx10566-10567 (Lougheed) (in writing a help description, an engineer was free to use even the "Gettysburg address").

The testimony of third-party witnesses and Arista's own witnesses corroborated this testimony by Cisco's witnesses. For example, engineers from Cisco's competitors Juniper Networks and Hewlett-Packard ("HP") testified that, even after Cisco launched its CLI, they continued to have a "green field" or "open pasture" to create entirely different CLIs. Appx12060-12061 (Phillip Shafer, Distinguished Engineer at Juniper Networks). An HP executive called by Arista testified that, "although some of the terms might be the same, different designers, even at the same company, can choose different words, different hierarchies, different syntax for the same functions." Appx12324 (Balaji Venkatraman, HP Senior Director of Product Management). As Juniper's Mr. Shafer testified upon being shown a list of Cisco commands, he could tell at a glance that they were "certainly not Juniper commands," because the "configuration" is different, and Juniper's CLI is "more hierarchical than Cisco CLI." Appx12063-12064 (Shafer) (referring to Tr. Ex. 4821 (Appx51349-51359)).[2]

---

[2] Documentary evidence, including Arista's own marketing presentation, confirmed such testimony about the expressive and organizational differences between Cisco's CLI and competitors' CLI. *See, e.g.*, Appx54388-54390 (Tr. Ex. 6380) ("HP
(*footnote continued*)

Arista's own witnesses likewise admitted that there were multiple alternative ways Cisco could have written and organized its CLI. Kenneth Duda, Arista's Chief Technology Officer and Senior Vice President of Software Engineering, admitted that it is "certainly technically achievable" to "come up with an alternative command language." Appx10802 (Duda). Another Arista executive admitted that, while he was at Cisco, Cisco engineers had had "healthy discussion[s]" about "how the commands should be structured, what they should say, what they should be." Appx10896-10897 (Anshul Sadana, Arista's Chief Customer Officer). Arista engineers debated "doing something very different" with their own CLI, but elected instead "to embrace the IOS CLI" so that Arista could "leverage all the partner training that Cisco does." Appx45468-45470 (Tr. Ex. 197) (Arista e-mail chain). And Arista admitted that its customers did need not to use a text-based CLI like Cisco's at all to configure and interact with network switches, as 20 percent of its customers use "an interface called Linux-interface that does not use the Cisco CLI commands." Appx10802 (Duda).

It was further undisputed at trial that no industry standard-setting organization sets any industry standard or protocol for how CLIs are written or selected, arranged,

---

Networking and Cisco CLI Reference Guide") (noting differences between HP operating systems and Cisco IOS in organization and terms used to describe features); Appx54234-54238 (Tr. Ex. 6095) (Arista presentation titled "Network World Test Report") (Arista internal document comparing Arista's "IOS-like CLI" with products from HP, Extreme and Dell which Arista deemed "Not consistent with IOS").

organized and designed.  *See* Appx11963 (Jayshree Ullal, Chief Executive Officer of Arista) (admitting that she was "not aware of any standards setting organization for command-line interface commands"); Appx11843-11844 (Hugh Holbrook, Arista's Vice President of Software Engineering) (admitting that he was "not aware of any standards-setting organization that has standardized what a command-line interface would be"); Appx12316 (HP's Venkatraman) ("there is no formal industry standard organization … that ratifies specifications for a CLI user interface for networking equipment").

### C.    The Trial Evidence On Arista's "Slavish" Copying

The undisputed evidence shows that Arista copied verbatim over 500 of Cisco's multiword command expressions to create its own competing CLI.  Appx1857-2067 (comparing commands).   Arista concedes that none of these 500+ particular commands, as written, had ever been used in a CLI before Cisco first used them. Appx12210 (Dr. John Black, Arista's technical expert); Appx12212 (Black).

Indeed, Arista's CTO Mr. Duda admitted that Arista "slavishly" copied these commands, even where "we thought they were really silly," in order to minimize customer retraining costs.  Appx10781 (Duda); Appx45473 (Tr. Ex. 203A) (Duda commenting in interview: "Our customers come very well trained, big  staffs of people who understand that—that particular CLI, and *we actually copied it slavishly*. Ya' know, it's like *even the things we thought were really silly, we went ahead and*

*copied them anyway* because we wanted it to be as seamless an experience for our customers as possible.") (emphasis added); *see* Appx10900 (Sadana) ("we used the same CLI for many of our base or core features.").  Another former Arista engineer had stated similarly that Arista copied Cisco's CLI in order to offer a "drop-in replacement" to its customers "given the 99.999 percent similarity in the CLI." Appx11030 (Lincoln Dale, former Arista Distinguished Engineer); *see* Appx11016 (Dale) (noting that, by offering a CLI just like Cisco's, Arista enabled its customers to "save re-training costs"); Appx12229-12230 (Black) (Arista "is a very close clone of the IOS CLI.  This is a major plus for the majority of customers who have already Cisco trained staff.").

Copying Cisco's CLI also enabled Arista to avoid expenditures it otherwise would have had to make on its own research and development to create an original user interface.  Appx50907 (Ullal) ("*[W]here we don't have to invent, we don't.*") (emphasis added); Appx46211 (Ullal) ("[I]t would take me 15 years and 15,000 engineers" to "compete with Cisco directly in the enterprise in a conventional way").

The undisputed evidence also showed Arista's verbatim copying of Cisco's command responses and help descriptions, as well as a collection of modes and prompts, which the undisputed evidence shows were indistinguishable when placed side-by-side.  Appx51144-51172 (command responses); Appx51137-51143 (help descriptions); Appx51059-51067 (modes and prompts).

17

### D.    The Trial Evidence On Scènes À Faire

Arista presented essentially no evidence during the two-week trial related to its scènes à faire defense.  Arista's technical expert Dr. Black testified briefly at trial that Cisco had used, within some of its multiword commands, certain "legacy" terms from "standards" bodies, and "common networking" terms.  Appx12107 (Black).  Dr. Black admitted that he had limited his analysis to "looking for individual terms" in standards documents that pre-dated Cisco's creation of its CLI, and that he had found not a single instance in which any of the 506 copied multiword commands, as written, had existed in any prior industry document.  Appx12207-12208 (Black); Appx12210 (Black).[3]

In addition, Dr. Black offered conclusory testimony that "[t]rying to be descriptive, trying to be clear, concise," "[us]ing abbreviations" or "names … familiar to people in the industry," and making a new command "fit in with the commands you already have" were "external constraints or considerations."  Appx12110-12113

---

[3]  *See also*, *e.g.*, Appx12096 (Black) (identifying from a "reference manual" a preexisting command beginning with word "show" and opining that some of Cisco's commands also include "the word 'show'"); Appx12097-12098 (Black) (individual "words" from manuals); Appx12099 (Black) (listing individual, one-word terms); Appx12100-12101 (Black) (describing list of "70 or 80" individual terms); Appx12101-12102 (Black) (individual "terms"); Appx12103 (Black) (individual words); Appx12103-12104 (Black) (same); Appx12106 (Black) (individual terms from ITEF publications); Appx12106-12107 (Black) (individual terms from IEEE publications).

(Black).  But Dr. Black conceded that these are merely "guidelines," "aspects" or "advice" as opposed to steadfast requirements.  Appx12112-12113 (Black) (referring to Cisco's "Parser Police Manifesto").[4]

### E.   The Jury Instructions

The district court instructed the jury that it could find copyright infringement if it found that "Cisco is the owner of a valid copyright" (Appx12669), "that Arista copied original, protected elements from Cisco's copyrighted works" (Appx12671), and that Arista's "copying was greater than *de minim[i]s*—that is[,] more than a trivial amount of Cisco's works as a whole" (Appx12675).  The court instructed that copying could be proved either by "direct evidence" like an admission or by "indirect evidence" like proof that Arista had access to Cisco's works and that "there is virtual identity between Arista's works and the original, protected elements of Cisco's works."  Appx12672.

The district court instructed the jury to limit its infringement analysis to five protectable *compilations*:

---

[4]   Cisco's "Parser Police Manifesto" (Appx46325-46329 (Tr. Ex. 851)) was an internal Cisco document setting forth "guidelines to engineers about the contents or the way they should develop the user interface, the command-line interface to Cisco products."  Appx10650 (Remaker).  It identified its purpose as "insur[ing] consistency, usability, and friendliness of the configuration interface to Cisco IOS," and provided such advice as "structure the parse tree not to have 'dead ends,'" "try to pick names that would be familiar to people in the industry," and "[c]ommands should tend to be self-explanatory."  Appx46325 (Tr. Ex. 851).

1. "The selection and arrangement of Cisco's multiword command-line expressions";

2. "The selection and arrangement of Cisco's modes and prompts";

3. "The collection of Cisco's screen responses and outputs";

4. "The collection of Cisco's help descriptions"; and

5. "Cisco's user interfaces as a whole as compilations of elements 1 through 4."

Appx12673. The instructions defined a "compilation" as "a work formed by the collection and assembling of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." Appx12670. The court instructed the jury that fifteen elements of Cisco's user interfaces were "*not* protectable," including "individual words used in any of the asserted elements," "any single multiword command," "the idea or method of grouping or clustering commands under common initial words," "any command hierarchy," "use of command syntax," and "the function of any asserted feature." Appx12673-12674 (emphasis added).

The district court instructed the jury on scènes à faire as follows:

> Scènes à faire is an affirmative defense to copyright infringement. To show that portions of Cisco's user interfaces are scènes à faire material, Arista must show that, at the time Cisco created the user interfaces, not at the time of any copying, external factors other than Cisco's creativity dictated that Cisco select, arrange, organize and design its original features in [the] manner it did. The scènes à faire doctrine depends on the circumstances presented to the creator at the time of creation, not the

> circumstances presented to the copier at the time it copied. Arista has the burden of proving this defense by a preponderance of the evidence.

Appx12680.

### F.    The Jury Verdict

The jury answered "Yes" to the question "Has Cisco proven that Arista infringed any of Cisco's user interfaces?" Appx1428. The jury also found that, "[a]s to the user interfaces [it] found to be infringed," Arista had failed to prove the affirmative defenses of fair use, merger, abandonment and copyright misuse but had proven the affirmative defense of scènes à faire. Appx1428-1429. The district court entered judgment for Arista. Appx1.

### G.    The District Court's JMOL Order

On post-trial motions, the district court denied Cisco's Rule 50(b) motion for JMOL. Appx2-20. In finding "substantial evidence in support of a scènes à faire defense" (Appx8), the court limited its consideration to evidence concerning the compilation of Cisco's multiword commands (Appx9) without reaching any other compilation at issue in the case (Appx17).

The district court ruled, *first*, that "there is evidence that at least certain selection and arrangement of multiword command-line expressions were constrained by functionality, and preexisting network industry protocols." Appx9; *see* Appx9-12. In support of this conclusion, the court cited evidence that certain "terms" appearing in Cisco's multiword commands, such as "ipv6" and "ip igmp," had appeared in

previous networking industry protocols. Appx10. The court also relied on Cisco engineers' testimony that they had "selected a few initial key words for 'functionality' and subsequent commands depend on what was already selected 'to fit in with that.'" Appx11 (quoting Appx10572-10573 (Lougheed)).

The district court ruled, *second*, that there was "substantial evidence that the selection and arrangement of the multiword command lines were constrained" by the "need to satisfy customers who wanted consistency." Appx11-12. In support of that conclusion, the court cited evidence that the purpose of Cisco's "'Parser Police' manifesto," a Cisco-developed internal command-writing aid for its engineers, is "'to ensure consistency, usability and friendliness of the configuration interface.'" Appx11-12 (quoting Appx10695 (Remaker)). The court also cited testimony that Cisco's customers expected its CLI to "'be consistent with stuff we've done before.'" Appx12 (quoting Appx10714 (Lougheed)).

The court rejected (Appx12) Cisco's argument that "the scènes à faire evidence in the record was directed to isolated words, terms, or acronyms within the expressions," stating (Appx12-13) that the jury could reasonably have concluded "that different command line expressions should be arranged and selected together if different terms in those command line expressions are defined and governed by the same industry standard protocol." The court also ruled that "a reasonable jury could

infer from the evidence regarding portions of the compilation that the entire compilation was dictated by external factors."  Appx13-14; *see also* Appx11.

Finally, the court rejected (Appx17-19) Cisco's alternative argument that scènes à faire cannot be a defense to virtually identical copying, finding (Appx19) that Cisco's Rule 50(a) motion had not preserved the issue because its argument for judgment on "scènes à faire" did not expressly contain the words "'virtually identical' copying." The district court accordingly denied Cisco's motion for JMOL. Appx20.[5]

## SUMMARY OF ARGUMENT

**I.**    No reasonable jury could find substantial evidence on the record here that Arista's infringement of Cisco's compilation of multiword command expressions is excused as scènes à faire.  This affirmative defense requires a showing that (1) factors ***external*** to Cisco's creativity (2) ***dictated*** that Cisco select, arrange, organize and design its overall compilation of commands in the manner it did (3) ***at the time*** Cisco created its compilation.  The record, however, fails to provide substantial evidence to establish, at the compilation level, any of those three elements, either for Cisco's compilation of multiword commands or for any of its other protectable compilations (command responses, help descriptions and modes and prompts).

---

[5]   Because the court denied Cisco's JMOL motion, it denied Arista's motion for JMOL or conditional new trial as moot.  Appx19-20.

The district court reached this erroneous conclusion by committing two fundamental legal errors. *First*, in finding that certain "selection and arrangement" of Cisco's commands were "constrained by functionality, and preexisting network industry protocols," the district court relied solely on the use of certain isolated, individual words or commands within Cisco's compilation, failing to identify scènes à faire at the level of a ***compilation***—the only relevant unit of analysis. Nor could a juror reasonably "infer" that use of preexisting materials for an individual command reflects scènes à faire as to the entire compilation, as a compilation may consist ***entirely*** of preexisting materials. *Second*, the district court legally erred in ruling that Cisco's compilation of commands was "constrained by customer demands" for "consistency, usability, and friendliness." Such vague, high-level aspirations are not external constraints at the time of creation but rather internal guidelines that describe any process for successful authorship going forward.

II.    Even if the trial record contained legally sufficient evidence to support scènes à faire (it does not), the defense independently fails as a matter of law because Ninth Circuit law preclude a scènes à faire defense for virtually identical copying. *See Apple Computer*, 35 F.3d at 1444. Here, the only conclusion a reasonable juror could reach is that Arista's copying was virtually identical. And contrary to the district court's suggestion, Cisco preserved the argument in its Rule 50(a) motion under the Ninth Circuit's liberal standard for such preservation.

# STANDARD OF REVIEW

Applying regional circuit law (here that of the Ninth Circuit), this Court reviews the denial of a JMOL motion *de novo*, reversing "when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Integrated Tech. Corp. v. Rudolph Techs., Inc.,* 734 F.3d 1352, 1356 (Fed. Cir. 2013) (quotations omitted).

The Ninth Circuit reviews denial of a JMOL motion for "substantial evidence," *i.e.*, "relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005). "[A] reasonable inference cannot be supported by only threadbare conclusory statements instead of significant probative evidence. Consequently, JMOL is appropriate when the jury could have relied only on speculation to reach its verdict." *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802-03 (9th Cir. 2009) (quotations and citations omitted). Further, on JMOL, the Court may consider undisputed and unimpeached testimony. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

# ARGUMENT

## I. JUDGMENT SHOULD BE GRANTED FOR CISCO ON SCÈNES À FAIRE AS A MATTER OF LAW BECAUSE NO REASONABLE JURY COULD FIND THAT ANY OF CISCO'S COMPILATIONS WAS DICTATED BY EXTERNAL FACTORS AT THE TIME OF CREATION

Under the Ninth Circuit law that governs the copyright liability issues in this case, *see Oracle*, 750 F.3d at 1353 (applying regional circuit law to copyright issues), Arista's infringement can be excused under the affirmative defense of scènes à faire only if, as the district court correctly instructed, "at the time Cisco created the user interfaces, not at the time of any copying, external factors other than Cisco's creativity dictated that Cisco select, arrange, organize and design its original features in [the] manner it did."  Appx12680.  As this Court previously explained, applying Ninth Circuit law, scènes à faire "provides that expressive elements of a work of authorship are not entitled to protection against infringement if they are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting." *Oracle*, 750 F.3d at 1363 (quotations omitted).  "In the computer context, 'the scène[s] à faire doctrine denies protection to program elements that are dictated by external factors such as 'the mechanical specifications of the computer on which a particular program is intended to run' or 'widely accepted programming practices within the computer industry.''"  *Id.* (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 963 (2d Cir. 1997)).  "Dictated" means that a chosen expression must be "'as a practical matter indispensable, or at least standard.'" *Apple*

*Computer*, 35 F.3d at 1444 (quoting *Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 530 (9th Cir. 1987)).

Because this case involves works that the district court deemed protectable only as *compilations*, the scènes à faire defense must operate at the compilation level too. In other words, scènes à faire can excuse Arista's infringement only if substantial evidence shows that factors external to Cisco's creativity dictated, at the time of creation, the "*selection, arrangement, organization and design*" of Cisco's compilation of multiword commands (or another of Cisco's protected compilations). Evidence of scènes à faire as to isolated terms within any of the compilations, even if sufficient to show scènes à faire as to those terms, is insufficient to show scènes à faire as to the *compilations* in which those terms appear.

Because the record contains no substantial evidence that the "selection, arrangement, organization and design" of Cisco's compilations was dictated by factors external to Cisco's creativity at the time of creation, this Court should reverse and direct entry of judgment for Cisco on copyright liability. Moreover, the district court's flawed analysis of the evidentiary record rested on two fundamental legal errors that underscore the need for reversal: The court erroneously identified "functionality" and terms from "pre-existing network industry protocols" as external constraints on Cisco's compilation of multiword commands. And the court erroneously treated the goal of internal "consistency" to satisfy "customer demands"

as a similar external constraint.  For all these reasons, the judgment below requires reversal.

### A.    The Record Lacks Substantial Evidence That Cisco's Compilation Of Multiword Commands Is Scènes À Faire

To begin with Cisco's protected compilation of multiword commands (the only compilation the district court analyzed in its JMOL order), the trial record fails to provide any substantial evidence that (1) *external* factors (2) *dictated* that Cisco select, arrange, organize and design its compilation of commands in the manner it did (3) *at the time* Cisco created its CLI.  The "external" element requires that the constraints originate outside the author.  The "dictated" element requires that a chosen expression be "'as a practical matter indispensable, or at least standard.'"  *Apple Computer*, 35 F.3d at 1444 (quotations omitted).  And the "at the time of creation" element requires that the external constraint preexist the asserted work.

Here, the relevant unit of analysis for all three elements of scènes à faire is the multiword-command *compilation*—namely, the selection, arrangement, organization and design by which Cisco compiled its multiword commands "as a whole." Appx12670 (jury instruction defining protectable compilation).  By their nature, compilations "can consist mainly or entirely of uncopyrightable elements," *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 204 (9th Cir. 1989), but are nonetheless protectable "if the selection and arrangement are original," *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 349 (1991).  The fact that some (or even

all) elements within a compilation individually constitute scènes à faire does not negate the protectability of the compilation. *See, e.g.*, *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (holding protectable compilation consisting entirely of scènes à faire elements); *Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, 2009 WL 723001, at *12-13 (D. Ariz. Mar. 18, 2009) (applying Ninth Circuit law) (holding that evidence of whether field names in database are scènes à faire is not relevant to whether the *"coordination, selection, and arrangement of these field names"* are scènes à faire) (emphasis added).

Because there was not legally sufficient evidence to establish, at the compilation level, any of the three elements required for scènes à faire, the judgment should be reversed. Cisco addresses each element in turn.

### 1. "External Factors"

The record fails to show substantial evidence that any asserted constraint on Cisco's creation of its compilation of multiword commands was *external* to Cisco.

*First*, the undisputed evidence, including Arista's own admissions, showed that no standard-setting body or industry protocol imposed any requirement that Cisco or any other company select, arrange, organize or design its multiword-command-line compilations in any particular way. *See* Appx11963 (Ullal) (admitting she was "not aware of any standards setting organization for command-line interface commands"); Appx11843-11844 (Holbrook) (admitting he was "not aware of any standards-setting

organization that has standardized what a command-line interface would be"); Appx12316 (HP's Venkatraman) (admitting that "there is no formal industry standard organization … that ratifies specifications for a CLI user interface for networking equipment").

*Second*, it was undisputed that there was no external mechanical or equipment-based constraint on how engineers can structure, sequence and organize a compilation of multiword commands. Any two engineers could write and then structure, sequence and organize whatever compilation of multiword commands they wished in order to configure and interact with a network switch—as disinterested third-party witnesses from Juniper and HP made clear in their testimony. Juniper's Mr. Shafer confirmed that a CLI designer operated, even after Cisco created its CLI, in an "open pasture" with innumerable options for compiling multiword commands. Appx12060-12061. HP's Mr. Venkatraman testified that "different designers, even at the same company, can choose different words, different hierarchies, different syntax for the same functions." Appx12324.[6] Arista's own witnesses agreed that Arista could have

---

[6] The district court erroneously disregarded all testimony from Mr. Shafer and Mr. Venkatraman, both of whom were disinterested, third-party witnesses, on the basis that "the jury was not required to believe such testimony." Appx13. However, on JMOL, the Court must credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses," *Reeves*, 530 U.S. at 151 (quotations omitted), and the district

(*footnote continued*)

30

"come up with an alternative command language" rather than copying Cisco's. Appx10802 (Duda).

For this reason, the district court's heavy reliance (Appx15-16) on *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366 (10th Cir. 1997), is misplaced. There, the Tenth Circuit found that the expression in the command codes at issue was "limited by significant hardware, compatibility, and industry requirements," such as a need for model cross-compatibility and "limits on the capabilities of the controller itself," as well as "values [that] were dictated by the limits inherent in the public telephone networks that the call controllers accessed." *Id.* at 1375. In other words, in *Mitel*, unlike here, technical interoperability across devices in the industry was an external constraint that dictated the command code choices. Any two operators needed to use the same expressions in order to operate the same public telephone network—and thus shared, non-proprietary hardware operated as an external constraint rendering the shared expression needed to use it scènes à faire. Here, in sharp contrast, different companies manufacture different proprietary switches and can write any CLI they want to operate those different switches. This case does not involve any issues of computer interoperability or compatibility between hardware models that might create any external constraint on the selection, arrangement, organization and design of multiword commands. *See,*

---

court identified no evidence contradicting their particular testimony. To the contrary, documentary evidence confirms their testimony. *See supra* n.2.

*e.g.*, *IvyMedia Corp. v. iLIKEBUS, Inc.*, 2017 WL 2125672, at *5 (D. Mass. May 15, 2017) (rejecting scènes à faire because the "concepts behind the headings [in website design] can be expressed in a variety of ways that do not include verbatim copying").

   *Third*, to the extent that the district court relied upon Cisco engineers' self-imposed constraints in selecting, arranging, organizing and designing its compilation of multiword commands, all such considerations were purely ***internal*** guidelines, not external constraints.  Cisco's "Parser Police Manifesto" (Appx46325-46329 (Tr. Ex. 851)), for example, provided "a set of ***guidelines*** to engineers about the contents or the way they should develop the user interface, the command-line interface to Cisco products."  Appx10650 (Remaker); *see* Appx10651 (Remaker) ("[I]t's actually not an authority.  It is a discussion group.  It's more of an advice group.").  Further, the Manifesto explains that the Parser Police "has no formal 'clearing' criteria," and because "it has no specific authority, parser-police derives its authority by having good answers, level-headed discourse, and a history of successes."  Appx46325 (Tr. Ex. 851).  Arista's own technical expert Dr. Black admitted that this Manifesto merely provided "guidelines," "aspects" or "advice" as opposed to steadfast requirements.  Appx12112-12113 (Black).  Nor are goals of "consistency," "clarity," or "user-friendliness" examples of external constraints, as Dr. Black conceded.  Appx12214-12215 (Black) (admitting that an author's goal of remaining consistent with prior choices is not an external constraint).

### 2.   "Dictated"

The evidence similarly fails to show that the selection, arrangement, organization, and design of Cisco's compilation of multiword commands were *dictated* by any external factors.  *First*, Arista's technical expert Dr. Black conceded after exhaustive review that *none* of the copied 500+ individual multiword commands, as written, had ever been used in a CLI before Cisco first used them.  Appx12210 (Black); Appx12212 (Black).

*Second*, the undisputed evidence showed that Cisco's engineers had abundant choices as to the selection, arrangement, organization of words within multiword commands, and of commands in relation to one other.  Arista's own witnesses admitted that Arista could have "come up with an alternative command language" rather than copying Cisco's CLI, Appx10802 (Duda), and that Cisco engineers debated "how the commands should be structured," Appx10896-10897 (Sadana).  Disinterested third-party witnesses likewise testified that engineers at Cisco's competitors had a "green field" or "open pasture" in which to write and structure alternative CLIs that did not copy Cisco's.  Appx12060-12061 (Juniper's Shafer).  As one of them stated, "although some of the terms might be the same, different designers, even at the same company, can choose different words, different hierarchies, different syntax for the same functions."   Appx12324 (HP's Venkatraman).

*Third*, any evidence of engineers' stylistic, aesthetic preference to use individual words or terms that are "familiar" to customers, as described in the "Parser Police Manifesto," *see* Appx12112-12113 (Black), falls far short of the legally required standard: namely, that the selection, arrangement, organization and design of the multiword commands is so ***indispensable*** as to be "dictated." As Cisco's Mr. Remaker explained, the Manifesto was not meant to "be binding on the professional judgment of the engineer authoring the command, it was just there for guidelines," Appx10654 (Remaker), which were "not always followed," Appx10662 (Remaker).

*Finally*, even when working within certain prescribed guidelines such as subject area, topic or vocabulary, authors have ample room to express creativity through their selection, arrangement, organization and design of elements in a manner that is not "dictated" by external constraints. *See, e.g.*, *B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1008 (D. Ariz. 2011) (applying Ninth Circuit law) (rejecting scènes à faire where "there are many different ways to express and organize" even the most "common business practices or ideas").

### 3.    "At The Time Of Creation"

Finally, the record does not contain substantial evidence of external constraints on Cisco's choices at the ***time of creation***.

*First*, while Arista repeatedly attempted to sow confusion on this issue by eliciting evidence that Cisco's CLI became an "industry standard" or a "*de facto*

industry standard," *see, e.g.*, Appx10934-10935 (Sadana); Appx11945 (Ullal), all such evidence necessarily relates to circumstances that existed *after* (and, indeed, *because*) Cisco's CLI became so successful and popular. Such evidence is legally irrelevant to scènes à faire. *Oracle*, 750 F.3d at 1364.

*Second*, both Arista's and disinterested third-party witnesses admitted that, at the time of creation, no standards-setting organization required multiword commands in a CLI to be arranged, organized or in any particular way. *See* Appx11963 (Ullal); Appx11843-11844 (Holbrook); Appx12316 (HP's Venkatraman); *Curcio Webb LLC v. Nat'l Benefit Programs Agency, Inc.*, 2006 WL 47506, at *6 (S.D. Ohio Jan. 9, 2006) (no scènes à faire absent evidence of "industry guidelines or standards that required [defendant] to have the same organization" as plaintiff).

*Third*, it was undisputed that no CLI organized in a hierarchical manner like Cisco's had even existed before Cisco created it. Appx10505 (Lougheed) ("I actually hadn't seen anyone other than what I was creating. So there were just, there were new demands that the other, older command-line interfaces would just not support."); Appx10518-10519 (Lougheed) ("[A]t this time there were no existing customers. There was no expectation of what sort of user interface or what choice of words people would use.").

For all the reasons, the district court should have granted JMOL for Cisco on scènes à faire.

**B.    The Record Lacks Substantial Evidence That Any Of Cisco's Other Compilations Is Scènes À Faire**

The district court reviewed only Cisco's compilation of multiword command expressions in its JMOL analysis, reasoning that the court needed only to find that one of Cisco's compilations was scènes à faire to deny JMOL to Cisco.  Appx17 ("the Court need not determine whether there is substantial scènes à faire evidence on the remaining protectable elements of Cisco's works").  But none of the other four compilations (*see* Appx12673) that were unaddressed in the decision below furnishes any alternative ground for affirmance.

To the contrary, the undisputed evidence fails to show that factors external to Cisco's creativity dictated its selection, arrangement, organization and design of Cisco's compilations in its modes and prompts, screen outputs or help descriptions at the time of creation.  Thus, *a fortiori* Cisco's user interfaces "as a whole," as compilations of the other four, cannot be scènes à faire.

Specifically, the undisputed evidence, including Arista's own admissions, forecloses any finding of scènes à faire as to the other compilations:

**Modes and prompts**:  Arista's technical expert Dr. Black expressly admitted that he found no evidence of Cisco's particular arrangement of its asserted modes and prompts in any preexisting document, Appx12220-12221 (Black), and failed to rebut Dr. Almeroth's testimony that "there's other ways" that Cisco's modes and prompts "could have been organized," Appx11238 (Almeroth).

**Command responses**:  Dr. Black offered no testimony that the compilation of command responses/screen outputs was dictated by external constraints and failed to rebut Dr. Almeroth's testimony that "there really aren't" any significant constraints in how to construct screen outputs because "[y]ou can include any information, you can organize it in any way."  Appx11236-11237 (Almeroth).

**Help descriptions**:  Dr. Black offered no testimony that the compilation of Cisco's help descriptions was dictated by external constraints and failed to rebut Dr. Almeroth's testimony that "[t]here aren't really constraints on what the user or the person designing those commands is allowed to include in terms of the help information."  Appx11237 (Almeroth).

**Overall compilation of compilations**:  Dr. Black offered no testimony that the compilation of Cisco's other compilations as a whole was dictated by external constraints and failed to rebut Dr. Almeroth's testimony that there was no such constraint as to the user interface as a whole considering all four components together. Appx11240 (Almeroth).

## C.    The District Court Committed Legal Error In Finding Scènes À Faire Based On "Functionality" And "Preexisting Network Industry Protocols"

In discounting all the above undisputed evidence, and thus finding substantial evidence to support the judgment of scènes à faire, the district court committed two fundamental legal errors that underscore the need for reversal.  *First*, it ruled that

"there is evidence that at least certain selection and arrangement of multiword command-line expressions were constrained by functionality, and preexisting network industry protocols." Appx9. *Second*, the court ruled that "there is also substantial evidence that selection and arrangement of the multiword command lines were constrained by customer demands," and in particular, the "need to satisfy customers who wanted consistency." Appx11-12.

## 1.    **"Functionality"**

The district court erred in concluding (Appx9) that "at least certain selection and arrangement of multiword command-line expressions were constrained by functionality,"

*First*, the district court's functionality reasoning confuses scènes à faire with merger—and the jury verdict expressly rejected Arista's affirmative defense of merger here. Appx1428. Merger applies if "Cisco had only one way or very few ways to express the ideas underlying the elements," but "material in an original work, ***even material that serves a function***, is not subject to merger as long as the author had more than a few ways to express the underlying idea." Appx12680 (jury instruction on merger) (emphasis added). As this Court has explained, "under Ninth Circuit law, an original work—even one that serves a function—is entitled to copyright protection as long as the author had multiple ways to express the underlying idea." *Oracle*, 750 F.3d at 1367. Thus, even if Cisco's compilation of commands was functional, the fact

that the jury rejected Arista's merger defense necessarily means that it could not simultaneously form the basis for a scènes à faire defense based on functionality.

*Second*, the jury could not properly have found any infringed portion of Cisco's multiword command compilation functional in light of the jury instructions, which specifically directed the jury to ignore "the function of any asserted feature" in its infringement analysis as "not protectable." Appx12673-12674. The jury must be presumed to have followed that instruction. *See, e.g.*, *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 770-71 & n.12 (9th Cir. 2005).

*Third*, the court mischaracterized Dr. Black's testimony as stating that "the functional choice of features to be implemented in a system dictates the contents of the **compilation** of CLI commands." Appx9 (citing Appx12126 (Black) (emphasis added)). In fact, Dr. Black's cited testimony stated only that a function may drive the selection of particular commands—such as selecting "a command for Virtual Router Redundancy Protocol (VRRP)" in order to "implement the VRRP protocol." Appx9 (citing Appx12256 (Black)). Nothing in that testimony supports the functional necessity of any particular arrangement or organization—the necessary unit of analysis for scènes à faire purposes here. *See Oracle*, 750 F. 3d at 1362-63 (noting that "Oracle is not seeking copyright protection for a specific short phrase or word," but rather for "declaring code … [of] 7,000 lines" based on the separate acts of "creativity in the selection and arrangement"); *id.* at 1364 (scènes à faire requires

showing that the "groupings" were "premised on features that were either commonplace or essential to the idea being expressed").

*Finally*, the district court's decision would undermine copyright protection for a wide variety of user interfaces and other hardware and software applications that are designed to be functional, undermining this Court's acknowledgment that, "under Ninth Circuit law, an original work—even one that serves a function—is entitled to copyright protection as long as the author had multiple ways to express the underlying idea." *Oracle*, 750 F.3d at 1367. That a compilation of commands is functional does not insulate it from infringement. *See, e.g.*, *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 66 (2d Cir. 1994) ("useful" selections and arrangements "unquestionably contribute to public knowledge"); *CDN Inc. v. Kapes*, 197 F.3d 1256, 1259-61 (9th Cir. 1999) (compilations of coin prices protectable). But the decision below invites an end-run around this Court's decision in *Oracle* by immunizing, under the rubric of scènes à faire, any infringer of a software compilation that can identify a few isolated words in that compilation that are "functional."

### 2.    "Preexisting Network Industry Protocols"

The district court further legally erred in finding that certain "testimony relating to preexisting standard network industry protocol[s]" was sufficient to support the judgment of scènes à faire—citing examples in which individual words, individual

commands, or "sub-groups" of commands had appeared.  Appx9-10.  This was error for multiple reasons.

*First*, the district court erred to the extent it analyzed  scènes à faire at the level of individual terms from preexisting industry protocols  rather than  at the compilation level.  *See* Appx9-10 (citing Cisco's use of the terms "VRRP" from Virtual Router Redundancy Protocol, "PTP" from Precision Time Protocol, and "PIM" from Protocol Independent Multitask Protocol).  To begin with, such reasoning contradicts the court's  own  instruction  that  Cisco's  user  interfaces  are  protectable  only  as compilations  and  that  "[i]ndividual  words"  or  even  "[a]ny  single  multiword command"  is  "not protectable."  Appx12673-12674.  If these elements are not protectable in the first place, they cannot support a finding of scènes à faire.

More  fundamentally,  given  that  Cisco  had  to  prove  infringement  at  the compilation level, the smallest protectable and infringeable level of analysis for scènes à faire purposes is likewise at the compilation level.  And given that a compilation may be made up entirely of preexisting materials, *see Harper House, Inc.*, 889 F.2d at 204, it is irrelevant whether any individual words or acronyms reflect "standard protocols" or use "industry terminology."  Otherwise, even the most unique and creative arrangement of preexisting materials would always be defeated by scènes à faire  based  on  the  mere  use  of  isolated  terms  or  acronyms—for  example,  any

compilation rights in software that happens to use the word "ip" for "internet protocol" would be scènes à faire, an absurd result.

The undisputed evidence concerning the use of hyphens makes clear why individual terms are different from the arrangement and organization of terms that make up a compilation—and thus why the use of individual preexisting terms from industry protocols cannot establish scènes à faire as to a compilation.  An engineer's decision to use a hyphen—which *restricts* how future commands could be incorporated—creates an entirely different organizational structure, even if the individual words are the same.  *See* Appx12218-12219 (Black) (using spaces "leaves elbow room," so decision to use a hyphen is "one of the things you have to decide"); Appx11235 (Almeroth) ("it's a design consideration whether [to] use a hyphen or not"); Appx11129 (Almeroth) ("really it's a consideration as to whether to use a hyphen … because it interferes with the hierarchy if you want to extend it").  For example, the command "dnsix dmdp" (no hyphen) allows for future commands to be added as subheadings under "dnsix."  But the command "dnsix-dmdp" (with hyphen), creates a single "top level command [that] precludes any other dnsix commands" to be added under the "dnsix" heading.  Appx46326-46327 (Tr. Ex. 851).  As another example, the ordering of individual words has a significant effect on the overall design of the compilation and reflects an aesthetic choice.  *See* Appx11233-11234 (Almeroth) (explaining that when deciding whether a command should be organized as "show ip

access lists" or "ip show access list," "[e]ither would be possible. Either would be an option. There's no constraint or limitation that it's one versus the other. … [It] was based on a creative choice by the engineer who developed it at that time."). Thus, the district court erred in scouring protocol documents for the mere existence of isolated industry terms.

*Second*, the district court likewise legally erred to the extent that it relied (Appx9) on "sub-groups of commands" in Cisco's multiword command compilations as a basis for its scènes à faire ruling. Again, such reasoning contradicts the court's own instruction that Cisco's user interfaces are protectable only as compilations and that "[a]ny command hierarchy" or "grouping or clustering of commands under initial words" is "not protectable." Appx12673-12674. The district court failed to identify a single "sub-group" that extends beyond a "command hierarchy" or "grouping or clustering of commands under initial words"—***unprotectable*** elements that cannot be the basis for either an infringement or a scènes à faire ruling.

But more fundamentally, a "sub-group" is simply not a compilation. The district court disregarded numerous cases holding scènes à faire as to an unprotectable portion or component of a compilation has no bearing on whether the selection, arrangement, organization and design of the compilation itself is scènes à faire. *See, e.g.*, *Metcalf*, 294 F.3d at 1074 (individual elements that constitute scènes à faire nonetheless protectable as a compilation); *Merch. Transaction Sys.*, 2009 WL

723001, at *12-13 (whether individual field names in database are scènes à faire not relevant to whether the "coordination, selection, and arrangement of these field names" are scènes à faire); *B2B CFO Partners*, 787 F. Supp. 2d at 1008 (scènes à faire in compilation applies to separate "original decisions regarding how to arrange and present" elements); *Harner v. Wong Corp.*, 2013 WL 11549284, at *7-9 (D.N.M. Oct. 31, 2013) (scènes à faire "not applicable" absent evidence addressing plaintiff's selection and arrangement of unprotected elements). The district court disregarded each of these cases because they were decided in the context of analytic dissection or summary judgment. Appx14-15. That distinction, however, has no bearing on the legal principle each of these courts found controlling—namely that where protection and infringement apply to a compilation, scènes à faire must apply to the compilation too. The district court cannot on one hand apply a certain set of rules to determine whether Cisco's compilation is protectable (instructing the jury to ignore individual words, individual commands, individual hierarchies, and even "groups" of commands that start with the same word), but on the other hand disregard those rules in assessing scènes à faire.

Unless reversed, the district court's suggestion that the preexistence of a "sub-group" of terms may defeat copyright protection for an original compilation would have broad consequences. For example, under the district court's analysis, isolated elements in a cookbook—such as ingredients, use of "industry" words such as "boil"

or "simmer," or even entire recipes—could give rise to a scènes à faire defense, ignoring that "the manner and order in which [recipes] are presented" is itself a separate act of creative authorship entitled to protection. *Publ'ns Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 482 (7th Cir. 1996) (whole cookbook protectable as a compilation, even if "individual recipes themselves" are not). The same principle likewise applies to other creative works, such as documentary films, anthologies, portfolios, databases, remixes, mash-ups, archival works, collections, mosaics and montages. Under the district court's approach, each of these would now be vulnerable to a scènes à faire defense merely because they contain "sub-groups" of terms that are individually unprotectable, even though the creativity claimed by the author is based on unique selection, arrangement, organization and design.

*Third*, the district court failed in its effort (Appx10-11) to elevate its scènes à faire analysis from the level of evidence concerning individual terms or "sub-groups" of terms to the level of evidence at the compilation level. To take the district court's key examples in turn:

**IP protocol version 6 (ipv6)**: The district court relied on Dr. Almeroth's testimony that the ipv6 protocol was standardized by the Internet Engineering Task Force (IETF); that "45 asserted commands used the industry standard 'IPV6' term"; and that "many" of those commands also "employ terms defined in the terminology section in the ipv6 document." Appx10. Again, the jury was instructed to ***disregard***

choices about individual words in commands, individual commands, or individual hierarchies; rather, it was restricted to assessing the protectability in Cisco's selection, arrangement, organization and design of its compilation as a whole—something for which there was no evidence as to Cisco's ipv6-related commands. Further, nothing in the documents cited by the district court addresses the "selection and arrangement of certain ivp6 commands," as the district court asserts (Appx10 (citing Appx51910-51946 (Tr. Ex. 5040); Appx57608-57656 (Tr. Ex. 6944))); the evidence merely indicates the existence of industry terminology without any indication of how such commands that employ such terminology are selected, arranged, organized or designed.

**Internet Group Management Protocol (ip igmp)**:  The district court similarly asserted (Appx10) that "five commands" starting with the term "ip gimp" (sic) were "selected and arranged based on the Internet Group Management Protocol (IGMP) industry standard."  But even construed in Arista's favor, the trial evidence showed nothing more than that these five *individual* commands happened to include terms from an industry standard document, Appx10 (citing Appx57544-57545 (Tr. Ex. 6877)); the record contains no evidence regarding each command's selection, let alone

the organization and arrangement of commands containing that term within any protectable Cisco compilation.[7]

**Open Shortest Path First (OSPF)**:  The court also asserted that OSPF commands "are selected and grouped together as the terms in different OSPF command line expressions are defined in the OSPF standard."  Appx10 (citing Appx51803-51909 (Tr. Ex. 5038)).  But the record evidence is limited to the mere use of the term "ospf"; neither Arista nor the district court identified any evidence pertaining to how those OSPF commands were selected, arranged and organized.  Indeed, among the 500+ asserted commands, 13 that employ "ospf" are in the "ip" hierarchy, 8 are in the "ipv6" hierarchy, and 11 are in the "show" hierarchy.  Thus, Cisco exercised creativity and judgment in deciding *where* and *how* to use commands containing these terms within the larger structure of its CLI.

**Other terms in industry-standard publications:**  The district court also noted that engineers were free to look at and use terms in industry-standard publications within their commands, and that such individual terms occasionally were used.

---

[7]   In addition, the IGMP protocol uses the cited terms "Query Interval," "Startup Query Interval," and "Startup Query Count" without the hyphens.  *See* Appx 10 (citing Appx57544-57545 (Tr. Ex. 6877)).  As discussed above, Cisco's decision to use hyphens fundamentally changes their structure.  *See* Appx11363 (Almeroth) (explaining that Cisco's use of "query-interval" phrase was not in the IGMP protocol because Cisco's "uses a hyphen," and "the person who designed this command had a choice whether to include the hyphen").

Appx10-11 (citing Appx57461-57526 (Tr. Ex. 6870)).  Again, Cisco's creation of an individual command is not evidence of a constraint on how Cisco selected, arranged and organized the command within its overall compilation of commands; all it demonstrates is that Cisco endeavored to use generally shared terminology.

**Preexisting knowledge of TOPS20**:  Finally, the district court referred to Dr. Black's testimony that a Cisco's employee "brought" PTP commands into Cisco's CLI based on her general knowledge of a preexisting system called TOPS20, and the general desire for PTP commands.  Appx11.  Again, there is no substantial evidence supporting that Cisco's choices as to selection, arrangement and organization of any PTP commands within Cisco's compilation as a whole were subject to any external constraints.  Otherwise, no CLI could ever benefit from copyright protection in a compilation—no matter how creative—merely because it dealt with the subject of PTP commands.

Thus, none of these examples comes close to showing scènes à faire as to the ***compilation*** of multiword commands.[8]  "A 'compilation' is a work formed by the

---

[8]   Arista cannot salvage this portion of the JMOL order by suggesting that, in these examples, the court somehow found "mini-compilations" that may count as scènes à faire.  A "group" is not a compilation, which is defined not by what the multiple elements are but rather by how they are structured and organized in the aggregate. Moreover, even if these examples had the attributes of a compilation (they do not), the jury was instructed that Cisco had to show that Arista copied more than a trivial amount of Cisco's work, Appx12675, and juries are presumed to follow the court's

(*footnote continued*)

collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work *as a whole* constitutes an original work of authorship."  17 U.S.C. § 101 (emphasis added); *see also Oracle*, 750 F.3d at 1355-56 (applying Ninth Circuit law) ("It is well established that copyright protection can extend to … non-literal elements of a computer program," which "include, among other things, the program's sequence, structure, and organization, as well as the program's user interface."); *Apple Computer*, 35 F.3d at 1446 (infringement of user interface can "be based on original selection and arrangement of unprotected elements"); *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1558 (11th Cir. 1996) ("[A] user interface … may be entitled to copyright protection as a compilation.").

Thus, "[w]hether sufficient selection, coordination, or arrangement is present is viewed in the aggregate, not piecemeal, since it is the compiler's efforts as a whole that count."  2 William F. Patry, PATRY ON COPYRIGHT § 3:65 (2017) (quotations omitted);  *see Softel, Inc.*, 118 F.3d 964 (2d Cir. 1997) ("[I]ndividual program elements that are 'filtered' out at one level may be copyrightable when viewed as part of an aggregate of elements at another level of abstraction.")

---

instructions.  *See Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1184 (9th Cir. 1988).  A faithful juror would have found these examples vanishingly trivial in relation to the 500+ commands that constituted the infringed portion of Cisco's multiword command compilation.

(quotations omitted).  For example, if the author of a telephone directory decides "which categories to include and under what name," her compilation is protectable even if within each category she lists entries alphabetically.  *Key Publ'ns, Inc. v. Chinatown Today Pub'g Enters., Inc.*, 945 F.2d 509, 514 (2d Cir. 1991); *see id.* ("[T]he individual categories chosen are irrelevant to our inquiry.  Rather, we are concerned with whether the arrangement of the Key Directory, viewed in the aggregate, is original.").[9]

*Finally*, even if some "sub-group" of Cisco's compilation of multiword commands were deemed scènes à faire, no reasonable jury could have made the inferential leap to the conclusion that any of Cisco's compilations of commands was scènes à faire.  "A reasonable inference is one that is plausible and that flows logically from the facts alleged …."  *Exergen  Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1329 n.5 (Fed. Cir. 2009); *see also* BLACK'S LAW DICTIONARY 897 (10th ed. 2014) (defining "inference" as "[a] conclusion reached by considering other facts and deducing a logical consequence from them"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435-36 (9th Cir. 1995) (citing *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) ("the only inferences permitted  … are those that are

---

[9]    The inverse is also true.  *See J. Thomas Distribs., Inc. v. Greenline Distribs., Inc.*, 100 F.3d 956 (6th Cir. 1996) (per curiam) ("copyright protection for plaintiff's compilation as a whole does not bestow copyright protection upon the specific portions of plaintiff's catalog").

reasonable *given the substantive law* which is the foundation for the claim or defense") (emphasis added)).  The record fails to show that any "sub-group" of Cisco's compilation of multiword commands allows for a "reasonable probability" that such "datum" supports Cisco's overall design of its compilation.  In *Key Publications*, for example, the Second Circuit not only held that protection of a compilation depends exclusively on "whether the arrangement of the [compilation], viewed in the aggregate, is original," but also explicitly recognized that the formatting of *sub-groups* within a compilation is irrelevant to that inquiry:  "the arrangement of categories in a classified directory is to be distinguished from the placement of a listing in a particular category.  Placing listings within categories is the sort of mechanical task that does not merit copyright protection."  945 F.2d at 514-15.  Similarly here, the district court merely speculated that a reasonable jury could draw "inferences" about Cisco's entire compilation from any supposed scènes à faire term or "sub-group."

To allow for such an inference, the record would have had to show not only that external constraints dictated that Cisco place certain commands within one hierarchy, but *also* that Cisco was precluded from placing such a command in an entirely different hierarchy.  The district court, however, did not identify any such constraints on Cisco's organization by preexisting network industry protocols.

The district court's legal error in deeming unprotectable preexisting terms and sub-groups sufficient to support scènes à faire for Cisco's protectable compilations thus requires reversal.

### D.   The District Court Committed Legal Error In Finding Scènes À Faire Based On "Customer Demands" For "Consistency"

The district court separately found that Cisco's compilation of multiword commands was "constrained" by external "customer demands" for consistency, usability and friendliness in its user interface, citing evidence, for example, of the goals of the "Parser Police Manifesto." Appx11-12 (citing Appx46325 (Tr. Ex. 851)). This was basic legal error in the interpretation of scènes à faire for multiple reasons.

*First*, seeking "consistency," "usability, "and "user-friendliness" in the arrangement and organization of a multiword command compilation is neither *external* nor a *constraint*.  It is not external but rather *internal*, driven by Cisco engineers' own aesthetic choices and preferences.  And it is not a constraint but rather just "a set of *guidelines* to engineers about the contents or the way they should develop the user interface, the command-line interface to Cisco products." Appx10650 (Remaker); *see* Appx10651 (Remaker) ("[I]t's actually not an authority. It is a discussion group.  It's more of an advice group.")  As the Manifesto itself explains, the Parser Police "has no formal 'clearing' criteria," and because "it has no specific authority, parser-police derives its authority by having good answers, level-headed discourse, and a history of successes." Appx46325 (Tr. Ex. 851).  And even

Arista's own technical expert Dr. Black was forced to agree, admitting that the Manifesto merely provides "guidelines," "aspects" or "advice" as opposed to steadfast requirements, Appx12112-12213 (Black).

*Second*, **customer demands** are not a constraint giving rise to scènes à faire. *See Curcio Webb*, 2006 WL 47506, at *6 (even if plaintiff developed the program "in accordance with [its] view of the 'best practices in the marketplace,'" this does not show scènes à faire, as there were no "industry guidelines or standards that required [defendant] to have the same organization"). Put another way, "[t]he fact that an arrangement of data responds logically to the needs of the market for which the compilation was prepared does not negate originality. To the contrary, the use of logic to solve the problems of how best to present the information being compiled is independent creation." *CCC Info. Servs.*, 44 F.3d at 67; *see also id.* at 66 ("Compilations that devise new and useful selections and arrangements of information unquestionably contribute to public knowledge."). Faulting an author for creating a product that is useful to its audience is particularly destructive when the work in question is a compilation, as "[t]he compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers." *Feist*, 499 U.S. at 348. Surely, a CLI need not consist entirely of **in**consistent and **un**useful features in order to survive scènes à

faire—a nonsensical outcome, particularly as applied to software and computer programs.

*Third*, the goal of being "clear" and consistent" does not negate creativity as the defense of scènes à faire would require. For example, the children's book *The Cat In The Hat* uses "simple" and "repetitive language" accompanied by characters that are "recognizable by and appealing to children." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396 (9th Cir. 1997). *The Cat In The Hat* uses only 236 words, derived from a set of first-grade vocabulary list of 348 words, for the purpose of creating a book easily readable by young children. That Dr. Seuss was "constrained" by features such as using particular words familiar to his audience, having an educational goal, and ensuring that his authorship was user-friendly and useable, does not mean that such guidelines "dictated" how he organized a compilation of words into sentences, or a compilation of sentences into an entire book. Even when working within certain prescribed guidelines, authors have ample room to express creativity through their selection, arrangement, organization and design of words and sentences to give rise to creative expression.

*Finally*, the fact that Cisco's users over time came to prefer its CLI over those of competitors is irrelevant, as "[t]he scènes à faire doctrine depends upon the circumstances presented to the creator at the time of creation, not the circumstances presented to the copier at the time it copied." Appx12680 (scènes à faire jury

instruction); *see Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1339, 1346 (5th Cir. 1994) (noting that the fact that "many of [defendant's] potential customers were already familiar with [plaintiff's] interface" does not render plaintiff's compilation unprotectable where the plaintiff "has selected data and arranged their placement in a way that is unique and original").

## II.    SCÈNES À FAIRE CANNOT SERVE AS A DEFENSE TO ARISTA'S VIRTUALLY IDENTICAL COPYING, AS A MATTER OF LAW

Even if the record otherwise contained substantial evidence to support scènes à faire (it does not), the defense independently fails. Scènes à faire has long been foreclosed as a defense where infringement consists, as here, of "virtually identical" copying. While scènes à faire precludes overly broad protection of stock themes, plots, tropes and characters (like "star-crossed lovers" or "spies with gadgets"), it does not supplant copyright protection for the particular expression of those ideas. Thus, as the Ninth Circuit has stated:

> The doctrine of scènes à faire is closely related [to merger]. … [A]s *Frybarger*[, 812 F.2d at 530] holds, "the mere ***indispensable*** expression of these ideas, based on the technical requirements of the videogame medium, ***may be protected only against virtually identical copying***." …. In this case, for example, use of overlapping windows inheres in the idea of windows. … [O]verlapping windows have been the clear preference in graphic interfaces. Accordingly, protectable substantial similarity cannot be based on the mere use of overlapping windows, although, of course, Apple's ***particular expression*** may be protected.

*Apple Computer*, 35 F.3d at 1444 (second emphasis added). That is, scènes à faire is not available when copying is "virtually identical." *Id.*; *see also, e.g.*, *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 764-65 (9th Cir. 2003) (applying *Apple Computer*).[10] As the ABA Model Instructions put the point, "if Shakespeare's *Romeo and Juliet* were copyrighted, an author could still write a play about two young people who fell in love but came to a tragic end because of a feud between their families. But the author could not copy the detailed plot of Shakespeare's play …." ABA MODEL JURY INSTRUCTIONS: COPYRIGHT, TRADEMARK AND TRADE DRESS LITIGATION § 1.4.8 at 29 (Todd S. Holbrook & Alan Nathan Harris eds., 2008). Similarly, if Arista's copying of Cisco's protected expression was "virtually identical," scènes à faire is per se unavailable as a defense. Here the record compels that inference.

### A. The Jury Necessarily Found That Arista's Copying Was Virtually Identical

Based on the jury's finding of infringement, the jury necessarily determined that Arista engaged in virtually identical copying of Cisco's protected expressions. *First*, if the jury found infringement based on "indirect evidence" of copying, it was *required* to find "virtual identity between Arista's works and the original protected

---

[10]  Sister circuits agree. *See, e.g.*, *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1014 (7th Cir. 2005) (scènes à faire material still protected from "virtually identical copying"); *Atari Games Corp. v. Oman*, 888 F.2d 878, 886 (D.C. Cir. 1989) (similar); *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979-80 (2d Cir. 1980) ("verbatim reproduction" not excused by scènes à faire).

elements of Cisco's works" under the district court's instructions. Appx12672-12673. Because the jury is presumed to have followed the Court's instructions, *see, e.g.*, *Bains LLC*, 405 F.3d at 770-71 & n.12, this scenario would necessarily foreclose any scènes à faire defense.

*Second*, even if the jury based its finding of infringement on "direct evidence" of Arista's copying, which does not require virtual identity as a legal element (*see* Appx19 n.2), no reasonable jury could have found that Arista's copying was anything other than virtually identical. Arista's own witnesses provided countless admissions of verbatim copying: (1) Arista admitted that it "slavishly" copied Cisco's CLI commands—even the ones its engineers "thought were really silly." Appx10781-10782 (Duda) (adding that "because "we don't believe [such slavish copying] was wrong"); Appx10878 (Duda); Appx11803 (Duda); Appx45473 (Tr. Ex. 203A) (Duda interview). (2) Arista openly touted to its customers that it could offer a "drop-in replacement" for Cisco CLI "given the 99.999 percent similarity in the CLI." Appx11030 (Dale); *see* Appx10900 (Sadana). (3) Arista told its customers that its commands were "identical" to Cisco's. Appx10926-10927 (Sadana) (commands are "identical"); Appx11017-11018 (Dale) ("identical"); Appx11022 (Dale) (commands are the "same"); Appx11025 (Dale) (same); Appx10900-10901 (Sadana) ("[W]e used the same CLI for many of our base or core features."); Appx11967 (Ullal) ("Arista people told customers that Arista had copied CLI commands into Arista products").

And the documentary evidence confirms the virtual identity of Arista's copying. Appx1857-2067 (comparing multiword command expressions); *see* Appx12528 (Almeroth) (multiword command expressions "are identical").[11]

### B.     Cisco Preserved The Argument That Scènes À Faire Cannot Excuse Arista's Virtually Identical Copying

Without disagreeing that Arista had engaged in virtually identical copying that would otherwise preclude a scènes à faire defense, the district court ruled (Appx18-19) that Cisco had forfeited that argument by not making it a more explicit basis for its Rule 50(a) motion for judgment on scènes à faire.  That ruling is incorrect.  Cisco's Rule 50(a) motion clearly put Arista on notice of its arguments that Arista had engaged in "virtually identical copying," and clearly stated non-exhaustive reasons why the record failed to demonstrate scènes à faire.  Appx1360-1361; Appx1365 (using the term "for example" and incorporating by reference "similar evidence" and "similar reasons").  That was more than enough to preserve the issue on a Rule 50(b) motion under the governing Ninth Circuit standard.

---

[11]   It is irrelevant that some of the commands at issue allow for user-provided inputs or parameters, as the Ninth Circuit has already held in the scènes à faire context that "user participation may not negate copyrightability of an audiovisual work." *Apple Computer*, 35 F.3d at 1444.  Further, Arista's own contributions cannot excuse the virtual identity of what it did copy. *See* Appx63144-63399 (Cisco commands appear in Arista's user interface); 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.03[B][1][a] (2017) ("No plagiarist can excuse the wrong by showing how much of his work he did not pirate.") (footnotes and citation omitted).

In the Ninth Circuit, to avoid an unnecessarily "harsh" rule, courts engage in "liberal interpretation" of Rule 50(a) motions, finding an issue properly preserved for purposes of Rule 50(b) even "'by an ambiguous or inartfully made motion' under Rule 50(a)." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989)).[12]  Other circuits are in accord.  *See, e.g.*, *Kusens v. Pascal Co.*, 448 F.3d 349, 361-63 (6th Cir. 2006) ("a broadly-stated argument" in a 50(a) motion sufficiently preserves a "more specifically stated post-verdict motion").  In *Antonick v. Electronic Arts, Inc.*, 841 F.3d 1062 (9th Cir. 2016), for example, the Ninth Circuit held that a movant had sufficiently preserved an argument that certain evidence was insufficient to show substantial similarity between the works as a whole.  The court so ruled even though the Rule 50(a) motion did not specifically articulate the argument in the pertinent section, reasoning that *other* sections of the motion had made clear that "the failure to place the source code in evidence was fatal" to making the relevant comparison.  *Id.* at 1067-68.  Similarly here, Cisco's Rule 50(a) motion placed Arista on adequate notice that Arista had engaged in "virtually identical copying," precluding a defense of scènes à faire.

---

[12]   Contrary to the district court's suggestion (Appx19 n.1), Cisco had no obligation to request that the court modify the scènes à faire jury instruction after the close of evidence, as the issue is equally preserved either through a motion for JMOL *or* by objecting to a jury instruction.  *See Reeves*, 881 F.2d at 1498.

It is a commonplace that arguments made in support of preserved issues on appeal are not limited to the precise legal arguments made in the court below, *see, e.g.*, *Yee v. Escondido*, 503 U.S. 519, 534 (1992) (upon preserving a claim, "a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below"); *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013) ("Once 'an issue claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties'") (quoting *Kamen v. Kemper Fin. Servs., Inc.* 500 U.S. 90, 99 (1991)); *id.* ("'parties are not limited to the precise arguments they made below'") (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995); *W. Watersheds Project v. U.S. Dep't of the Interior*, 677 F.3d 922, 925 (9th Cir. 2012) ("[W]e do not require a party to file comprehensive trial briefs on every argument that might support a position on an issue."). Given the Ninth Circuit's recognition that Rule 50(b) may be satisfied even "by an ambiguous or inartfully made motion under Rule 50(a)," *Go Daddy Software,* 581 F.3d at 961, it is clear *a fortiori* that Cisco was not obligated to set forth in its Rule 50(a) motion every possible legal argument in support of judgment on scènes à faire.

## CONCLUSION

This Court should reverse the judgment below, direct entry of judgment for Cisco on copyright liability, and remand for further proceedings.


Dated:  September 13, 2017                    Respectfully submitted,

                                              /s/ Kathleen M. Sullivan
                                              Kathleen M. Sullivan
                                              Todd Anten
                                              Owen Roberts
                                              QUINN EMANUEL URQUHART &
                                                 SULLIVAN, LLP
                                              51 Madison Avenue, 22nd Floor
                                              New York, NY  10010
                                              (212) 849-7000

                                              Sean S. Pak
                                              QUINN EMANUEL URQUHART
                                                 & SULLIVAN, LLP
                                              50 California Street, 22nd Floor
                                              San Francisco, CA 94111
                                              (415) 875-6600

                                              *Attorneys for Plaintiff-Appellant*

## ADDENDUM

Judgment                                   Judgment of December 19, 2016
(Appx1)


Order                                      Order Denying Motions for Judgment as a
(Appx2-20)                                 Matter of Law and Motion for a New Trial

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| CISCO SYSTEMS, INC, | Case No.  14-cv-05344-BLF |
| Plaintiff, |  |
| v. | **JUDGMENT** |
| ARISTA NETWORKS, INC., |  |
| Defendant. |  |

This action came before the Court for trial by jury, the undersigned Judge presiding, on November 18, 28, 29, 30, December 1, 2, 5, 6, 7, 8, 9, 12, 13, 14, 2016.  The jury returned its verdict on December 14, 2016.  Consistent with that verdict, which is attached hereto, JUDGMENT is hereby entered in favor of Defendant Arista Networks, Inc. and against Plaintiff Cisco Systems, Inc. and Plaintiff shall take nothing by its suit.  Any remaining claims or defenses of the parties are hereby DISMISSED.  Defendant shall recover from Plaintiff the costs of suit according to proof.

**IT IS SO ORDERED.**

Dated: December 19, 2016

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

**Appx1**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CISCO SYSTEMS INC, | Case No.  14-cv-05344-BLF |
| Plaintiff, | |
| v. | **ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL** |
| ARISTA NETWORKS, INC., | |
| Defendant. | |

Following a two-week trial, a jury collectively found that Defendant Arista Networks, Inc. ("Arista") infringed Plaintiff Cisco Systems, Inc. ("Cisco" )'s asserted user interfaces but that the infringement was excused by the scènes à faire affirmative defense.

Cisco now moves on two grounds to amend the Court's judgment as a matter of law.  Mot., ECF 761.  Arista also conditionally moves on several grounds to amend the Court's judgment as a matter of law and for a new trial.  ECF 760.  For the reasons stated below, the Court DENIES Cisco's motion and finds that Arista's motions are moot.

## I.    BACKGROUND

### A.    Factual Background

Cisco and Arista are competitors who make and sell Ethernet switches, which connect multiple devices within a local area network and can direct traffic on the network.  Founded in 1984, and one of the pioneers of networking technologies, Cisco developed an "Internetwork Operating System" ("IOS") that allowed engineers to configure and manage Cisco servers, routers, and switches.  Cisco has obtained copyright registrations on the various versions of its IOS and associated technical manuals.  Arista, founded in 2004, by former Cisco executives, also sells networking equipment using an "Extensible Operating System" ("EOS").

Cisco brought suit against Arista, claiming that Arista violated its copyrights and infringed

United States District Court
Northern District of California

its patents. ECF 1. For its copyright infringement claim, Cisco asserted that Arista infringed the user interfaces found in four Cisco operating systems as well as the associated technical documentation. Second Am. Compl. ("SAC") ¶ 27, ECF 64. Cisco owns twenty-six copyright registrations based on various versions of its four operating systems. *Id.* ¶ 25. The operating systems were developed for use with Cisco's networking products, including its routers and switches. *Id.* ¶ 6. Cisco's operating systems employed text-based user interfaces (referred to by Cisco as command-line user interfaces or "CLI"), which is the primary mechanism for network engineers to interact with switches and routers. *See* Analytic Dissection Order ("AD Order"), ECF 740. When a network engineer or system operator types multiword command expressions into the user interface, the expressions are then displayed on a screen that is connected to the networking device. *Id.* Cisco claimed that its CLIs contain at least the following protected elements: (1) multi-word command expressions, (2) multi-word command hierarchies, (3) modes and prompts, (4) command responses or screen outputs; and (5) help descriptions, an overview of which is provided below. Mot. 1, 4.

With respect to "multiword command expressions," Cisco claimed that more than 500 of the multiword command expressions across four operating systems are protectable and copied by Arista. SAC ¶ 51. Examples of multiword command expressions include "boot system," "show inventory," "area nssa translate type7 always," and "spanning-tree portfast bpdufilter default." *See, e.g.*, Tr. Ex. 4803, Ex. I to Jenkins Decl., ECF 761-10. According to Cisco, these command expressions are also grouped by initial words into collections to reflect multi-level textual hierarchies. AD Order. For illustration purposes, part of the "show" command hierarchy is shown below.

```
show
        show arp
        show clock
        show environment
                show environment all
                show environment power
                show environment temperature
```

Once the operator inputs a multiword command expression, the switch or router analyzes the command and responds by displaying textual screen outputs on screen. Cisco referred to these

2

**Appx3**

textual displays in response to the operator's input as "command responses" or "command outputs." The Cisco CLI further provides a selection of modes that permit an operator to access greater or fewer command expressions based on operator status. For example, an operator who has entered "Privilege EXEC" mode will have access to different commands than a user who is in "User EXEC" mode. Different modes are indicated by different textual titles and different textual prompts that appear on the screen (e.g., "(config-if)#" or "(config)#"). These prompts are used to indicate to the operator which mode he or she is in, and thus which commands the operator has access to. Additionally, the Cisco CLI allows the operator to ask for help in using the multiword command expressions by typing a command followed by "?". The screen will then display text that describes the command or any other information to assist the operator in managing or configuring the network device in relation to the inquired command.

Cisco also asserted claims of copyright infringement of its user manuals and patent infringement but those claims are not relevant to the parties' instant motions.

### B.    Procedural History

Cisco filed its original complaint on December 5, 2014. ECF 1. Toward the end of a hard-fought litigation, the parties sought summary judgment on various issues, such as copyrightability, copyright infringement, the affirmative defense of fair use, and patent infringement of U.S. Patent No. 7,047,526. On August 23, 2016, for reasons stated in the Court's order, the summary judgment motions were denied in their entirety and those issues as well as others proceeded to trial. ECF 482.

Around the same time, the Court also requested the parties to submit several rounds of briefing on "analytic dissection," to assist the Court in performing a part of the extrinsic test pursuant to the Ninth Circuit's two-part test for determining copyright infringement. ECF 740. Analytic dissection aims to separate unprotectable ideas from potentially protectable expressions prior to determining the scope of copyright protection and comparing the works for similarity. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442-43 (9th Cir. 1994). After reviewing the parties' briefing on analytic dissection and holding a hearing, the Court found several aspects of the asserted elements to be unprotectable, including "individual words," "individual multiword

United States District Court
Northern District of California

3

**Appx4**

command line expressions," "individual help description phrases," "specific modes and specific prompts," and others.  *See* AD Order.  However, the Court found each of the following protectable as a compilation: (1) multiword command expressions; (2) modes and prompts; (3) command responses; and (4) help descriptions.  The Court also found that each of Cisco's user interfaces as a whole is subject to protection as a compilation of those four elements.  *Id.*

From November 18 to December 14, 2016, the Court held a jury trial on Cisco's copyright infringement claims, infringement claims of one of its patents, and Arista's defenses.  At trial, the jury was instructed that Cisco's copyrighted works are "Cisco's four user interfaces for IOS, IOS XR, IOS XE, and NX-OS."  Tr. 2668:19-22 (Instr. No. 25).  They were also instructed that to prove infringement, Cisco was required to show that it "is the owner of a valid copyright," that "Arista copied original, protected elements from Cisco's copyrighted works," and that Arista's "copying was greater than *de minimis*, that is, more than a trivial amount of Cisco's works as a whole."  Tr. 2669:12-16 (Instr. No. 29), 2671:23-24 (Instr. No. 36), 2675:6-7 (Instr. No. 41).  Cisco could establish copying in either of two ways: (1) "direct evidence," such as Arista's admissions of copying; or (2) "indirect evidence," namely proof that (a) Arista had access to Cisco's works, and (b) "there is virtual identity between Arista's works and the original, protected elements of Cisco's works."  Tr. 2672:1-11 (Instr. No. 36).  With respect to "indirect evidence," the Court also instructed the jury on protectable elements and unprotectable elements, based on the Court's analytic dissection ruling.  Specifically, the Court listed the "following elements of Cisco's works protected as a compilation if you [the jury] find that they are original":

1. The selection and arrangement of Cisco's multiword command-line expressions;

2. The selection and arrangement of Cisco's modes and prompts;

3. The collection of Cisco's screen responses and outputs;

4. The collection of Cisco's help descriptions;

5. Cisco's user interfaces as a whole as compilations of elements 1 through 4;

6. Each of Cisco's technical manuals.

Tr. 2673:4:16. (Instr. No. 39).  The Court further instructed the jury not to consider elements the

United States District Court
Northern District of California

Court has deemed unprotectable pursuant to analytic dissection, such as individual words or individual command line expressions.  Tr. 2673:17-2674:14.  (Instr. No. 39).

Also relevant to Cisco's JMOL motion is the instruction on the affirmative defense of scènes à faire, which the Court instructed the jury as follows:

> Scenes a faire is an affirmative defense to copyright infringement.
> To show that portions of Cisco's user interfaces are scenes a faire material, Arista must show that, at the time Cisco created the user interfaces—not at the time of any copying—external factors other than Cisco's creativity dictated that Cisco select, arrange, organize and design its original features in the manner it did. The scenes a faire doctrine depends on the circumstances presented to the creator at the time of creation, not the circumstances presented to the copier at the time it copied.
> Arista has the burden of proving this defense by a preponderance of the evidence.

Tr. 2680:12-25 (Instr. No. 61).

After deliberation, the jury returned a verdict on December 14, 2016, finding that Cisco has proven copyright infringement of at least one of its user interfaces and that Arista has proven the scènes à faire defense.  Tr. 2827:1-8; Verdict, ECF 750-1.  The Court entered judgment on December 19, 2016, in favor of Arista.  ECF 669.

The parties filed their respective post-trial motions on January 17, 2017.  ECF 760, 761. The Court then held a hearing on these motions on April 27, 2017.  ECF 783.

## II.    CISCO'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.    Legal Standard

Federal Rule of Civil Procedure 50(b) allows a party to renew no later than 28 days after the entry of judgment, a motion of for judgment as a matter law made under Rule 50(a) that was not granted by the Court.  Fed. R. Civ. P. 50(b).  Under Ninth Circuit law, a renewed motion for judgment as a matter of law should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *see also Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1314 (Fed. Cir. 2006) ("A motion for JMOL is properly granted only if no reasonable juror could find in the non-movant's favor.") (citing *Sanghvi v. City of Claremont*, 328 F.3d 532, 536 (9th Cir. 2003)).  "Conversely, '[i]f

5

reasonable minds could differ as to the import of the evidence, . . . a verdict should not be directed.'" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

In reviewing a motion for a judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1241 (9th Cir. 2014). "'[A]lthough the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe,' and may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Harper v. City of Los Angeles*, 533 F3d 1010, 1021 (9th Cir. 2008).

**B.    Substantial Evidence In Support of the Scènes à Faire Defense to Copyright Infringement Liability**

Cisco argues that the record provides no substantial evidence to support the jury's verdict on the defense of scènes à faire because evidence on external constraints was not directed to the protectable compilations but was directed to individual words, terms, or acronyms of the multiword command-line expressions. Mot. 13. Cisco also contends that the evidence fails to show that the external considerations dictated the selection, arrangement, organization and design of the protectable compilations at the time of creation. *Id.* at 13-14.

In opposition, Arista responds that the jury instruction – as proposed by Cisco – correctly sets forth the law on scènes à faire. Opp'n 4-5, ECF 763. Arista also argues that the scenes à faire inquiry is flexible and can include "considerations of efficiency" and "compatibility with equipment." *Id.* at 5-6 (citing *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1370 (Fed. Cir. 2014); *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1375 (10th Cir. 1997)). Arista also claims it needed only to put forward evidence allowing a rational jury to find that scènes à faire applied to the same portion of Cisco's compilation that it found infringed and not to all compilations. Opp'n 7. Arista also points to various evidence in the record as relevant and substantial in support of the

United States District Court
Northern District of California

6

jury's verdict, such as the nature of the command-line interface, pre-existing conventions, and customer requirements. *Id.* at 8, 10-15.

As a preliminary matter, it is undisputed by the parties for the purpose of Cisco's motion that the jury was properly instructed on the defense of scènes à faire, stating that "Arista must show that, at the time Cisco created the user interfaces—not at the time of any copying—external factors other than Cisco's creativity dictated that Cisco select, arrange, organize and design its original features in the manner it did." Tr. 2680:12-25 (Instr. No. 61); Mot. 4; Opp'n 4-5. Cisco, however, charges Arista with "water[ing] down the governing legal standards" based on Arista's arguments relating to "efficiency" or "consistency." Reply 1-2; *e.g.*, Opp'n 3-4. Regardless, the parties do not dispute the jury was properly instructed so the instruction given to the jury controls here. *See Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1184 (9th Cir. 1988) ("absent a contrary finding, it must be assumed the court's instructions were followed").

The Federal Circuit has set forth an overview of the scènes à faire doctrine as follows:

> The scènes à faire doctrine . . . provides that "expressive elements of a work of authorship are not entitled to protection against infringement if they are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting." [*Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997)]. Under this doctrine, "when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore are not protected by copyright." *Swirsky v. Carey,* 376 F.3d 841, 850 (9th Cir. 2004). In the computer context, "the scènes à faire doctrine denies protection to program elements that are dictated by external factors such as 'the mechanical specifications of the computer on which a particular program is intended to run' or 'widely accepted programming practices within the computer industry.'" [*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 963 (2d Cir. 1997)] (citation omitted).

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1363 (Fed. Cir. 2014) (applying Ninth Circuit law). The "dictated" element requires that a chosen expression be "'as a practical matter indispensable, or at least standard.'" *Apple Computer*, 35 F.3d at 1444 (quoting *Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 530 (9th Cir. 1987)).

Considering this legal standard and viewing the record in light most favorable to the verdict, the record provides substantial evidence in support of a scènes à faire defense.

7

**Appx8**

Additionally, the Court finds that substantial evidence in support of a scènes à faire defense in this case need not comprehensively cover the entirety of Cisco's works but only that portion the jury found to be infringed. First, a reasonable jury could very well have found only one protectable element of Cisco's works to be original. Instr. No. 39. Second, the jury, in following the instructions as we presume it did, must have found that there was copying of that original, protectable element and that the copying was "more than a trivial amount of Cisco's works as a whole." Instr. No. 41. However, the verdict form did not require the jury to identify the specific protectable elements it found to be original. Nor did it require the jury to elaborate on the quantity or the qualitative significance of the copied portion in support of its finding that the copying was more than "de minimis." Thus, the copied and protected portion found by the jury could be just one of the following: (1) the selection and arrangement of Cisco's multiword command-line expressions; (2) the selection and arrangement of Cisco's modes and prompts; (3) the collection of Cisco's screen responses and outputs; (4) the collection of Cisco's help descriptions; (5) Cisco's user interfaces as a whole as compilations of elements 1 through 4.

Assuming that "selection and arrangement of Cisco's multiword command-line expressions" was the element that the jury found protected and copied, the jury's verdict is supported by substantial evidence. First, there is evidence that at least certain selection and arrangement of multiword command-line expressions were constrained by functionality, and preexisting network industry protocols. For example, Arista's expert, Dr. Black, testified that as a technical matter, the functional choice of features to be implemented in a system dictates the contents of the compilation of CLI commands. Tr. (Black) 2126:2-14 (compilation of commands driven by features). Dr. Black explained that commands are linked to and driven by device features, both at the level of individual commands or sub-groups of commands and as to the overall compilation of commands within the CLI. *See, e.g.*, *id.*; *id.* at 2256:9-2258:10 (testifying that "it [would not] make sense" to have a command for Virtual Router Redundancy Protocol (VRRP) if the networking vendor does not implement the VRRP protocol; stating the same with respect to PTP commands). Based on this testimony, a reasonable jury could conclude the selection of commands to create the compilation, such as the selection and arrangement of VRRP

**Appx9**

1    and PTP commands, for example, was constrained by functionality.

2    This conclusion is further bolstered by other testimony relating to preexisting standard

3    network industry protocol.  Cisco's expert, Dr. Almeroth, testified at trial that IP protocol version

4    6 ("ipv6") was one of the internet protocols standardized by the Internet Engineering Task Force

5    ("IETF").  Tr. 1293:5-25; Tr. Ex. 5040.  He also stated that "[a] number of commands at issue in

6    this case [] use ipv6."  Dr. Almeroth further admitted "some RFC's [Request for Comments

7    publications from the IETF] like this [ipv6 document] have terminology and glossary sections."

8    Tr. Ex. 6944 (RFC 791, dated 1981).  Many command line expressions of the ipv6 group employ

9    terms defined in the terminology section in the ipv6 document.  Tr. 1295:13-1298:15; *see also* Tr.

10   1347:17-19 (45 asserted commands used the industry standard "IPv6" term).  As such, based on

11   this testimony, a reasonable jury could find that the selection and arrangement of certain ipv6

12   commands are dictated by the references to features and functionalities of the ipv6 standard

13   protocol as defined by the IETF.

14   Another example is the "ip gimp" commands, in which five commands, including "ip gimp

15   query-internal," "ip gimp startup-query-interval," and "ip gimp startup-query-count" were selected

16   and arranged based on the Internet Group Management Protocol (IGMP) industry standard.  Tr.

17   Ex. 6877 at 18-19 (RFC 2236, dated Nov. 1997).  The trial exhibit shows that, for example,

18   "query-internal," "startup-query-interval," and "startup-query-count" are terms defined in the

19   IGMP standard protocol.  Similarly, various "Open Shortest Path First (OSPF)" commands are

20   selected and grouped together as the terms in different OSPF command line expressions are

21   defined in the OSPF industry standard.  Tr. Ex. 65038 (RFC 1131, dated 1989).  In fact, "Cisco

22   engineers [were] free to use industry standard publications when they come up with commands"

23   according to a Cisco engineer, Mr. Phillip Remaker.  Tr. 689:10-18.  And "[m]any of the terms in

24   Cisco's CLI commands were taken directly from various networking industry protocols."  Tr.

25   (Almeroth) 1291:250-1292:4.  *See also* Tr. (Almeroth) 1365:13-23; TX 6870 (PIM protocol

26   specification) ("There were many [] protocols that are relevant to the commands at issue in this

27   case," including the PIM (protocol independent multitask) protocol, which appears in roughly 20

28   of the commands); Tr. (Juniper witness Shafer) at 2069:6-2072:8 (many CLI commands and

United States District Court
Northern District of California

9

**Appx10**

United States District Court
Northern District of California

1  features are identical between Juniper JUNOS and Cisco IOS because "the design constraints in

2  creating a CLI" made the overlapping features "the obvious choice").

3       Testimony by Cisco's engineers provides additional evidence that the selection and

4  arrangement of the multiword command lines were constrained by functions and networking

5  standards.  At trial, Mr. Kirk Lougheed, one of the Cisco engineers involved in the development of

6  Cisco's CLIs, testified that "command name" is "the beginning set of words, words that use the

7  command, that basically define the command," Tr. 624:9-14, and that the commands were

8  selected based on a few initial key words for "functionality" and subsequent commands depend on

9  what was already selected "to fit in with that," and other considerations on selecting the

10  commands include the need to be "reasonable and logical," and "something that would make sense

11  to [network managers and support people]." Tr. 572:16-573:13.  Dr. Black, Arista's expert, also

12  testified that Tong Liu, a Cisco employee "brought [PTP] commands into the Cisco CLI" based

13  her knowledge of pre-existing system named TOPS20 and the need to implement the precision

14  time protocol. Tr. 2094:14-2095:5.  Thus, there was substantial evidence that the selection and

15  arrangement of commands were dictated by the need for certain functionality and to "fit in with"

16  that functionality.

17       Based on the exemplary evidence discussed above, a reasonable jury could conclude that

18  Cisco selected and arranged the multiword command expressions based on functionalities defined

19  by the industry networking protocols, such that, for example, expressions referencing all the

20  features and functions defined in the IGMP, OSPF, and ipv6 standards are selected and arranged

21  accordingly.  While this evidence relates to certain groups of commands, it also implicates

22  selection and arrangement of other commands, as a rational jury was entitled to make inferences to

23  that effect.  The jury could reasonably infer that constraints flowing from the overall industry

24  context and the basic functional nature of the CLI dictated the overall structure and arrangement of

25  Cisco's asserted compilation of commands that the jury found was original and infringed.

26       Second, there is also substantial evidence that selection and arrangement of the multiword

27  command lines were constrained by customer demands.  For example, Mr. Remaker testified

28  about Cisco's "Parser Police" manifesto, which provided guidelines to Cisco engineers in creating

10

the multiword command expressions. Tr. 694:24-695:4. Mr. Remaker admitted that the purpose this document is "to ensure consistency, usability and friendliness of the configuration interface" and he further stated that "Cisco's customers expect [consistency]." Tr. 694:1-23; Tr. Ex. 851 (Ex. B to Opp'n), ECF 763-1. A reasonable jury could view these rules as a summary of external constraints on the creation of the collection of multiword command expressions to satisfy customer needs and technical requirements.

Testimony from other witnesses also supports this conclusion. Mr. Lougheed testified that "when we went into the market place, [we discovered that people] wanted to run traffic from the networks of [other preexisting vendors] . . . so we started adding these other network protocols . . . in addition to the internet protocol into our system." Tr. 513:23-514:5. Mr. Lougheed further stated that "[t]he constraint is because we have to be consistent with stuff we've done before." Tr. 714:18-19. According to Lougheed, "[e]lements of command development that are important [include] backwards compatibility with what exists, thinking about future extensibility, considering the engineer's own preferences and thinking about what the customers might have." Tr. 653:10-17. Dr. Black, Arista's expert, also testified that CLI was created with a "consistency with all the preceding CLI's that did the same thing, and that's what engineers would expect." Tr. 2214:1-2. Based on the testimony and the evidence, a reasonable jury could conclude that Cisco's selection and arrangement of elements in the compilation of multiword command lines was dictated by the need to satisfy customers who wanted consistency, as well as functions from pre-existing systems.

Cisco argues that that the scènes à faire evidence in the record was directed to isolated words, terms, or acronyms within the expressions. Reply 6. Cisco contends, for example, that the evidence relating to standard industry networking protocols is directed to individual terms and thus insufficient. *Id.* at 8. While there was evidence directed to isolated words, terms, acronyms, syntax or other unprotectable elements, there was also evidence relevant to the selection and arrangement of the compilation of command line expressions. Specifically, with regard to evidence relating to standard industry networking protocols, it is reasonable for a jury to conclude that different command line expressions should be arranged and selected together if different

United States District Court
Northern District of California

11

**Appx12**

terms in those command line expressions are defined and governed by the same industry standard protocol. Thus, in accordance with the exhibits and testimony discussed above, a reasonable jury could draw conclusions and reasonable inferences that several factors constrained the selection and arrangement of the command line expressions. Factors may include customer demand, industry standards of networking protocols, and other rules set forth in the Parser Police manifesto, to name a few.

Even though Cisco insists that the evidence in the record was directed to only individual terms and did not rebut Cisco's "undisputed" evidence, such as Dr. Almeroth's testimony on Cisco engineers' "creative choice," this contention fails to account for the evidence discussed above that is relevant to the selection and arrangement of the individual command expressions to create the compilation. Mot. 5-7. The Court recognizes that certain testimony, such as that of Mr. Phillip Shafer from Juniper Networks, or Mr. Balaji Venkatraman from HP, could support Cisco's argument that there were no "constraints" in the creation of the compilation of multiword command expressions. *Id.* at 8-9. However, the jury was not required to believe such testimony and such testimony in Cisco's favor was not "uncontradicted." *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (noting that on JMOL, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe"). In reviewing the record on a motion to amend judgment, the Court must "review the record as a whole," and "must draw all reasonable references in favor of the nonmoving party." *Johnson*, 251 F.3d at 1227 (internal quotations omitted). Given that the identified testimony of Mr. Shafer, Mr. Venkatraman, or Dr. Almeroth is disputed, a jury is not required to believe that particular opinion testimony. As such, evidence from the record proffered by Cisco that is in its favor is insufficient to overturn the jury verdict.

Cisco further argued at the hearing that the evidence in the record is not relevant to the selection and arrangement of the entirety of the compilation. Specifically, Cisco contended that the "piecemeal" evidence proffered in Arista's opposition is not sufficient to show scènes à faire for the totality of the compilation. Apr. 27, 2017 Hr'g Tr. 57:16-18; 58:10-20, ECF 786. This argument, however, points more towards a different jury instruction which is not before the Court.

United States District Court
Northern District of California

1    Moreover, a reasonable jury could infer from the evidence regarding portions of the compilation

2    that the entire compilation was dictated by external factors.

3         Cisco's reliance on *Merch. Transaction Sys., Inc. v. Nelcela, Inc.* is also unavailing.  Reply

4    3-4; No. 02-1954, 2009 WL 723001, at *13 (D. Ariz. Mar. 18, 2009).  The plaintiffs in *Merch.*

5    *Transaction* sought protection for the organizational structure of a software database, such as "the

6    design and layout of the database, the accompanying database structures and definitions (table and

7    column names and data types), file names and structures" and others.  *Id.* at *12.  Addressing the

8    defendant's argument that the "field names" are unprotectable, the court agreed that the

9    "individual field names are unprotected under the scènes à faire doctrine as they are generally a

10   result of customary programming practices."  *Id.*  However, given that the plaintiffs sought

11   protection of the compilation of those elements, and not the elements individually, the court found

12   the compilation protectable, stating that it "cannot conclude that no reasonable juror could not find

13   creativity in the selection and arrangement" of those elements.  *Id.* at *13.  In reaching that

14   conclusion, the court reasoned that the individual field names "may become numerous enough and

15   their selection and arrangement original enough that their combination constitutes an original

16   work."  *Id.*

17        Given that *Merch. Transaction* concerned analytic dissection and invoked a standard akin

18   to summary judgment, it has limited application on a motion to amend judgment.  The ruling

19   reached in *Merch. Transaction* with respect to field names is similar to the analytic dissection

20   ruling in this case, where the Court found that the individual terms and individual multiword

21   command expressions are not protectable, but that their selection and arrangement into a

22   compilation could be.  However, the court in *Merch. Transaction* was not reviewing the record for

23   substantial evidence and was not confronted with evidence showing factors constraining the

24   selection and arrangement of command line expressions, as those discussed above.

25        Cisco also argues that substantial evidence must show that a plaintiff's "use of the exact

26   arrangement" of the relevant elements in their "exact order" was "dictated" by external factors.

27   Reply 3 (citing *Merch. Transaction*, 2009 WL 723001, at *12-13).  However, in selectively

28   quoting *Merch. Transaction*, Cisco ignores what the court stated immediately following those

United States District Court
Northern District of California

13

**Appx14**

selective quotes: "nor is there anything to suggest that common sense or efficiency considerations dictated [defendant's] use of the same abbreviations in the exact order as [plaintiffs']." *Id.* at \*13. The Court finds that Cisco overstates *Merch. Transaction*'s dicta on the "exactness" of the arrangement, and fails to account for the different standard under which *Merch. Transaction* was decided.

Other cases that Cisco cites in support of its motion pertain to cases on summary judgments and fail to negate the substantial evidence in this case supporting the jury's verdict. *See, e.g.*, *B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1005, 1007-08 (D. Ariz. 2011) (on a motion for partial summary judgment, rejecting the scènes à faire defense and finding that the plaintiff's training manual "may contain some common business practices or ideas" but that the expression did "not naturally flow from the business concepts contained therein"); *Metcalf v. Bochco*, 294 F.3d 1069, 1072, 1074 (9th Cir. 2002) (reversing summary judgment, noting that scènes à faire prohibits protection of the "idea of an idealistic young professional choosing between financial and emotional reward, or of love triangles . . . , or of political forces interfering with private action, but that the combination could satisfy the extrinsic test"); *Curcio Webb LLC v. Nat'l Ben. Programs Agency, Inc.*, No. C2-03-559, 2006 WL 47506, at \*6 (S.D. Ohio Jan. 9, 2006) (refusing to grant summary judgment based on the scènes à faire defense because the defendant did not establish that there was "a custom within the industry or that such organization and language is advisable" in a form used by the plaintiff to procure bids on behalf of its clients); *Harner v. Wong Corp.*, No. 12-00820, 2013 WL 11549284, at \*1, 9 (D.N.M. Oct. 31, 2013) (concluding on summary judgment that the scènes à faire doctrine was not applicable because the combination of the photos, while individually unprotectable, rendered the advertisement unique).

Instead, the Court finds *Mitel, Inc. v. Iqtel, Inc.* more instructive than the above-cited cases. 124 F.3d 1366, 1368 (10th Cir. 1997). The court in *Mitel* affirmed the lower court's denial of a preliminary injunction motion because the scènes à faire doctrine barred plaintiff Mitel's command codes from copyright protection. *Id.* at 1375. The *Mitel* court evaluated whether the lower court property found that "a set of four-digit numeric instructions known as "command codes'" was not protectable. *Id.* Mitel created these command codes to access the features of

telecommunications hardware known as a call controller. *Id.* at 1367-68. Because Mitel
controlled a large share of the call controller market, the defendant argued that it could compete
with Mitel only if its controller were compatible with Mitel's controller. *Id.* at 1369. The court
noted that for computer-related applications, external factors in support of the scènes à faire
defense can include "software standards and compatibility requirements, computer manufacturer
design standards, industry programming practices, and practices and demands of the industry
being serviced." *Id.* at 1375. The court further explained that "[b]ecause these factors concern
functional aspects of a work, the scènes à faire doctrine plays a particularly important role in
ensuring that copyright rewards and stimulates artistic creativity in a utilitarian work "in a manner
that permits the free use and development of non-protectable ideas and processes" that make the
work useful. *Id.* (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 711 (2d Cir.
1992). Affirming the lower court's ruling, the *Mitel* court first found that the values of the
command codes "were selected by Mitel's product management department in response to
customer demand or to ensure compatibility with equipment." *Mitel*, 124 F.3d at 1375. The court
also found that "[s]tandard programming conventions such as '1' for 'on' and '0' for 'off'
determined some of the descriptions and values." *Id.* The court then concluded that Mitel's
command codes "were dictated by external functionality" and were not protectable. *Id.* at 1376.

Although Mitel concerned a preliminary injunction, its reasoning on computer-related
applications is relevant to this case. Here, the witness testimony and other evidence, discussed
above regarding networking industry protocols and pre-existing networking systems, fall squarely
in *Mitel*'s list of factors that could support a scènes à faire defense, such as "software standards
and compatibility requirements, computer manufacturer design standards." *Mitel*, 124 F.3d at
1375. Like the standard programming conventions that dictated Mitel's command codes, evidence
regarding customers' demands and the rules set forth in Cisco's Parser Police manifesto similarly
support the jury's verdict that the compilation of multiword command expressions was "dictated
by considerations of efficiency," and "industry programming practices, and practices and demands
of the industry being serviced," factors recognized by the courts that can support a scènes à faire
defense. *See Oracle*, 750 F.3d at 1370; *Mitel*, 124 F.3d at 1375. Accordingly, the jury's scènes à

15

**Appx16**

faire verdict is supported by the substantial evidence identified in the record and consistent with case law.

The parties also dispute whether there is substantial evidence of scènes à faire directed to other elements of Cisco's works: the selection and arrangement of Cisco's modes and prompts; the collection of Cisco's screen responses and outputs; the collection of Cisco's help descriptions; Cisco's user interfaces as a whole as compilations of the preceding elements. However, given that the Court has already determined that there is substantial evidence on the selection and arrangement of Cisco's command line expressions that a rational jury could rely on to support this verdict, it is "simply not relevant" that some other evidence regarding other protectable elements might potentially have supported a different verdict. *See Johnson*, 251 F.3d at 1227. As noted above, the copyright infringement verdict only required a rational jury to find one of the listed protectable elements to be original and infringed as long as the infringed portion is more than "de minimis." Even if there were no substantial scènes à faire evidence with respect to the remaining protectable elements, the substantial scènes à faire evidence with respect to the selection and arrangement of the command line expressions could still support the verdict. Thus, the Court need not determine whether there is substantial scènes à faire evidence on the remaining protectable elements of Cisco's works.

### C.     The Scènes à Faire Defense to Virtually Identical Copying

As a separate ground for its motion, Cisco also argues that scènes à faire does not excuse virtually identical copying. Mot. 22 (citing *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994)). According to Cisco, the record and evidence show that the jury necessarily found "virtually identical" copying. *Id.* at 23. Cisco then concludes that the scènes à faire defense is foreclosed as a matter of law. *Id.* at 24.

Arista counters that Cisco forfeited this argument by failing to raise it under Rule 50(a). Opp'n 21. Arista further argues that there is no support for the conclusion that the infringement was necessarily based on "virtually identical" copying. *Id.* at 23-24. According to Arista, the jury instruction on direct evidence of copying does not require a finding of "virtually identical" copying and Cisco was actually opposed to incorporating the phrase, "virtual identity," into the

United States District Court
Northern District of California

16

**Appx17**

United States District Court
Northern District of California

1    jury instruction on "direct evidence" of copying. *Id.* at 22. Arista also avers that the case law

2    cited by Cisco does not support the conclusion that "direct evidence" of copying is equivalent to

3    "virtually identical" copying or that the scènes à faire defense is inapplicable here. *Id.* at 23.

4        Because a post-verdict Rule 50(b) challenge is a renewed motion, it "is limited to the

5    grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software,*

6    *Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "Thus, a party cannot properly 'raise arguments in its

7    post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its

8    preverdict Rule 50(a) motion.'" *Id.* (citation omitted).

9        The Court finds that Cisco forfeited this argument by not raising it under Rule 50(a). In its

10   50(a) motion, Cisco's entire scènes à faire portion reads as follows:

> For similar reasons, and based on similar evidence, no reasonable jury
> could find that, at the time Cisco created its works, external factors other
> than Cisco's creativity "dictated" that Cisco select, arrange, organize and
> design its original features in the manner it did, and thus Cisco is entitled
> to judgment as a matter of law on Arista's scènes à faire affirmative
> defense. Jury Inst. 61. For example, Arista does not dispute that no
> standard-setting organizations or customer preconceptions required Cisco
> to design the expressions in its user interface as it did (e.g., Tr. 1963:5-8
> (Ullal)); to the contrary, as Mr. Shafer of Juniper testified, the creative
> process within Cisco was a "greenfield" or "open pasture," without
> constraints, at the time the user interfaces were created. Tr. 2060:17-
> 2061:3 (Shafer).

18   ECF 732 at 14:7-15. Nowhere in Cisco's Rule 50(a) motion is there an argument that scènes à

19   faire is not a defense to "virtually identical" copying. Relying on *Antonick v. Elec. Arts, Inc.*,

20   Cisco argues that it was not obligated to "set forth every possible legal argument" in its Rule 50(a)

21   motion. Reply 14 (citing 841 F.3d 1062, 1068 (9th Cir. 2016)). However, this misstates the law.

22   While "Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion,'" the argument

23   in some form still needs to be made. *See id.* (citing *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th

24   Cir. 1989)). The plaintiff in *Antonick* argued that the 50(b) motion on whether there was

25   substantial evidence on similarity of the works as a whole should not have been considered

26   because the 50(a) motion only argued that the evidence was insufficient to show substantial

27   similarity between the two protectable elements of the code. 841 F.3d at 1067. The Ninth Circuit

28

United States District Court
Northern District of California

1 rejected that argument because both motions argued that the failure to place source code in

2 evidence was fatal to the claim of copying. *Id.* at 1068.

3       In contrast to *Antonick*, the portion of Cisco's Rule 50(a) motion pertaining to scènes à

4 faire made no mention of "virtually identical" copying, let alone whether scènes à faire can be a

5 defense to "virtually identical" copying. The Rule 50(a) motion only argued that there were no

6 external factors that "required Cisco to design the expressions in its user interface as it did." As

7 such, the issue is not that the argument was inartfully or ambiguously made but that it was not

8 made at all.[1] The Court thus finds this argument waived and will not consider it as a ground in

9 support of Cisco's motion to amend the judgment.[2]

10 ## III.    ARISTA'S MOTION FOR JUDGMENT AS A MATTER OF LAW

11       Although it prevailed at trial, Arista also filed a Rule 50(b) motion requesting judgment as

12 a matter of law that: (1) Cisco does not own any protectable original expression in the asserted

13 CLIs; and (2) Cisco has not proven any protectable compilation of CLI elements; (3) there is no

14 copyright infringement given the "thin" protection that applies to Cisco's works; (4) jury lacked

15 sufficient evidence to consider and compare the disputed works as a whole; (5) the user interfaces

16 are not copyrighted works separate from Cisco's complete registered operation systems; (6)

17 Arista's conduct is fair use; (7) Cisco abandoned its copyrights; (8) Cisco has misused its

18 copyrights; and (8) Arista is entitled to merger as a defense. Arista also moves for a new trial for

19 the same reasons under Rule 59. At the April 27, 2017 hearing, Arista agreed that, if the Court

20 denied Cisco's motion, Arista motion is moot. Accordingly, because the Court denies Cisco's

---

[1] Had Cisco timely raised this issue at the jury instruction conference or at the 50(a) motion, the Court could have considered providing a jury instruction on the matter.
[2] The verdict form did not require the jury to identify whether they applied a "virtual identity" standard to arrive at the copyright infringement verdict. Nor did it require them to specify whether they relied on "direct" or "indirect" evidence in support of the verdict. While the instruction on "indirect evidence" required the jury to find liability on a "virtual identity" standard, the instructions on "direct evidence" of copying did not. Instr. Nos. 36, 38, 39. In order to render its argument relevant, Cisco nonetheless assumes that the jury must have found "virtually identical" copying even if they were to rely on "direct evidence." This assumption does not necessarily hold true as the jury instruction on "direct evidence" of copying did not require application of such a standard. As such, a reasonable jury could still find copyright infringement based on direct evidence without applying the "virtual identity" standard. Accordingly, a scènes à faire defense verdict would not be incorrect as a matter of law even if Cisco's argument that scènes à faire is not a defense to "virtually identical" copying were to be legally correct.

18

**Appx19**

1   motion, as set forth above in Section II, Arista's motions are moot.

2   **IV.**    **ORDER**

3       For the foregoing reasons, IT IS HEREBY ORDERED that:

4       1.   Cisco's motion for judgment as a matter of law is DENIED.

5       2.   Arista's motion for judgment as a matter of law and conditional motion for new trial

6           are MOOT.

7

8       **IT IS SO ORDERED.**

9

10   Dated: May 10, 2017

11

12                              BETH LABSON FREEMAN

                              United States District Judge

*United States District Court*
*Northern District of California*

19

**Appx20**

**PROOF OF SERVICE**

The undersigned hereby certifies that on September 13, 2017, I electronically

field the foregoing BRIEF FOR PLAINTIFF-APPELLANT with the Clerk of the

Court for the United States Court of Appeals for the Federal Circuit by using the

appellate CM/ECF system.  I certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Kathleen M. Sullivan
Kathleen M. Sullivan

# CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellant hereby certifies that:

1.    This brief complies with the type-volume limitation of Fed. Cir. Rule 32(a) because it contains **13,754** words (based on the Microsoft Word word-count function) excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. Rule 32(b).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated:  September 13, 2017

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan